2012 WY 85

**Bill KUHL, Appellant (Plaintiff),**

v.

**WELLS FARGO BANK, N.A.,
Appellee (Defendant).**

No. S–11–0221.

Supreme Court of Wyoming.

June 15, 2012.

Representing Appellant: Bernard Q. Phelan, Phelan Law Offices, Cheyenne, Wyoming.

Representing Appellee: Matthew E. Turner, Mullikin, Larson & Swift, LLC, Jackson, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Bill Kuhl brought wrongful termination claims against his former employer, Wells Fargo Bank, N.A. The district court granted summary judgment against him and in favor of Wells Fargo, and Mr. Kuhl appeals that ruling. We will affirm.

## ISSUES

[¶ 2] Mr. Kuhl raises these issues:

1. Did the district court err in granting summary judgment in favor of Wells Fargo on Mr. Kuhl's claim for breach of an express contract of employment?

2. Did the district court err in granting summary judgment in favor of Wells Fargo on Mr. Kuhl's claim for breach of an implied contract of employment?

3. Did the district court err in granting summary judgment in favor of Wells Fargo on Mr. Kuhl's claim for promissory estoppel?

4. Did the district court err in granting summary judgment in favor of Wells Fargo on Mr. Kuhl's claim for tortious breach of the implied covenant of good faith and fair dealing?

## FACTS

[¶ 3] Mr. Kuhl became president of the First State Bank of Pinedale on June 1, 2007. That bank was owned by United Bancorporation of Wyoming, Inc., which also owned several other banks in Wyoming and Idaho. Later that year, Mr. Kuhl learned that Wells Fargo Bank, N.A., was planning to purchase several banks from United Bancorporation, including the First State Bank of Pinedale. The sale was scheduled to close on July 1, 2008.

[¶ 4] In March of 2008, Mr. Kuhl attended a meeting at which the sales agreement was presented for shareholder approval. From that agreement, he learned that the presidents of three other banks being purchased by Wells Fargo would be offered written two-year employment contracts with Wells Fargo. Mr. Kuhl was not on the list of bank presidents to be offered such a contract.

[¶ 5] In April of 2008, Wells Fargo's Human Resources Manager for Wyoming, Colorado, and Montana, Brad Nations, came to the First State Bank to deliver written employment offers to those employees Wells Fargo wanted to retain. Mr. Kuhl was among those, and at the end of the day, Mr. Nations provided him with a letter offering him employment with Wells Fargo. The let-

ter was signed by Michael J. Matthews, "Regional President—Wyoming." The first paragraph informed Mr. Kuhl that Wells Fargo was "committed to retaining key employees such as you through this transition." The letter also set forth a base salary, retention bonus payments after six months and one year employment, and other employment details. The third paragraph of the letter repeated that Wells Fargo was

> committed to retaining key employees such as yourself. To that end, I want to confirm that while there may be process changes as we move through the transition, you should expect it to generally be "business as usual." This means that you should continue to perform your job duties.

[¶ 6] On the second page of the letter, immediately below Mr. Matthews' signature line, text appeared inside a box setting forth **"Conditions of Employment at Wells Fargo"** (bold in original), beginning with this:

> Employment with Wells Fargo has no specified term or length. Both a team member and Wells Fargo have the right to terminate a team member's employment at any time, with or without advance notice and with or without cause. This is called "employment at will" and no employee of Wells Fargo has the authority to alter this arrangement without the express authorization of a Wells Fargo officer at the level of executive vice president or higher.

Mr. Kuhl claims that this "employment at will" language seemed to conflict with other portions of the letter indicating that Wells Fargo wanted to retain him. He asked Mr. Nations about the "employment at will" language. The response is disputed, but Mr. Kuhl contends that Mr. Nations told him his employment could be terminated only if he did something illegal.

[¶ 7] After the meeting with Mr. Nations, but before the bank purchase was closed, Mr. Kuhl received a form entitled "Wells Fargo Acquisition Eligibility Form." It requested certain employment-related information from Mr. Kuhl, and provided additional information about Wells Fargo. Immediately above Mr. Kuhl's signature appeared this language: "This application does not constitute a contract of employment. Employment and com-

pensation can be terminated with or without notice, and with or without cause, at any time." Mr. Kuhl signed the document on April 30, 2008.

[¶ 8] On this same date, Mr. Kuhl signed a "Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non–Solicitation, and Assignment of Inventions." This three-page form provided information on the listed topics, and included Mr. Kuhl's agreement not to solicit business from Wells Fargo customers for a period of one year following termination of employment. At the top of the third page was this section:

**VI. Employment At Will**

> I understand that my employment with the Company is "at will" and nothing in this document changes, alters or modifies my "at will" status or my obligation to comply with all policies, procedures and rules of the Company, as they may be adopted or amended from time to time. My employment at will status may not be changed except in writing, signed by me and an executive officer of the Company.

(Bold in original.)

[¶ 9] Also on this date, Mr. Kuhl signed a "Team Member Acknowledgement." In it, he acknowledged that he had received or would be provided with a "Handbook for Wells Fargo Team Members." The Acknowledgement document also stated, "I understand that the policies it [the Handbook] contains do not constitute an express or implied contract of employment, and that employment is at will."

[¶ 10] In the Handbook Mr. Kuhl received, the first lines of the Introduction section provided as follows:

> Your *Handbook* contains essential information about your job, your supervisor, your fellow team members and the Wells Fargo family of companies. We encourage you to read this book and keep it in a convenient place. It's meant as an outline of policies and procedures covering Wells Fargo and its subsidiaries—it is not a contract of employee "rights," nor does it attempt to offer an answer for every situation. Employment at Wells Fargo is on an **"at-will"** basis (see the description on page 10).

(Italics and emphasis in original.) The referenced "description on page 10" was in Chapter 2, entitled "Employment & Hiring," and provided as follows:

> This *Handbook* is not a contract of employment. Your employment with a Wells Fargo company has no specified term or length; both you and Wells Fargo have the right to terminate your employment at any time, with or without advance notice and with or without cause.
>
> This is called "employment at will." Only an officer of Wells Fargo at the level of executive vice president or higher, authorized by the senior Human Resources Manager for your region or line of business, may alter your at-will status or enter into an agreement for employment for a specified period of time. Any modification to your at-will employment status must be confirmed in writing by an officer of Wells Fargo at the level of executive vice president or higher, authorized by the senior Human Resources Manager for your region or line of business.

(Italics in original.) The same two paragraphs were repeated in Chapter 4 of the Handbook, entitled "Performance & Problem Solving," which also included information on performance reviews, performance counseling, and corrective action. Identical language was also found in Chapter 9 of the Handbook, entitled "Leaving Wells Fargo," which provided information about terminating employment with Wells Fargo, "[w]hether the decision to terminate employment is yours or Wells Fargo's."

[¶ 11] In June of 2008, Mr. Kuhl received a letter from Wells Fargo saying it was "excited to have you join us as a team member." It advised him that his title would be "Community Bank President 2," and that his "Current salary remains the same." On the second page of this letter is text inside a box, nearly identical to the text in the letter previously delivered by Mr. Nations, repeating that employment with Wells Fargo was "employment at will."

[¶ 12] Wells Fargo's purchase of the banks was finalized on or about July 1, 2008, and Mr. Kuhl began working for Wells Fargo. The employment relationship between Mr. Kuhl and Wells Fargo deteriorated rapidly after the closing, however. The reasons are in dispute, but are not material at this summary judgment stage. Wells Fargo terminated Mr. Kuhl's employment on December 10, 2008. Mr. Kuhl brought a wrongful termination suit against Wells Fargo, alleging breach of an express contract of employment, breach of an implied contract of employment, promissory estoppel, and tortious breach of the implied covenant of good faith and fair dealing. After the parties engaged in discovery, Wells Fargo moved for summary judgment. Mr. Kuhl resisted that motion. Following a hearing, the district court granted summary judgment against Mr. Kuhl and in favor of Wells Fargo, leading to this appeal.

### STANDARD OF REVIEW

[¶ 13] A district court's decision to grant summary judgment is subject to the following standard of review:

> Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c); *Metz Beverage Co. v. Wyoming Beverages, Inc.*, 2002 WY 21, ¶ 9, 39 P.3d 1051, 1055 (Wyo.2002). "A genuine issue of material fact exists when a disputed fact, if it were proven, would establish or refute an essential element of a cause of action or a defense that the parties have asserted." *Id.* Because summary judgment involves a purely legal determination, we undertake *de novo* review of a trial court's summary judgment decision. *Glenn v. Union Pacific R.R. Co.*, 2008 WY 16, ¶ 6, 176 P.3d 640, 642 (Wyo.2008).

*Jacobs Ranch Coal Co. v. Thunder Basin Coal Co., LLC*, 2008 WY 101, ¶ 8, 191 P.3d 125, 128–29 (Wyo.2008).

### DISCUSSION

*Express Contract*

[¶ 14] When an employment contract is silent about duration, and does not specify reasons for termination, the employment relationship is presumed to be at-will. *Brodie v. General Chemical Corp.*, 934 P.2d

1263, 1265 (Wyo.1997). "In an at-will employment relationship, either the employer or the employee may terminate the relationship at any time, for any reason or for no reason at all." *Boone v. Frontier Refining, Inc.*, 987 P.2d 681, 685 (Wyo.1999). The presumption of at-will employment may be rebutted "by a showing that the parties entered into an express or implied agreement which prohibited the employer from discharging the employee without just cause," or that the employment would last for a set term. *Id.* The existence of an express agreement, written or oral, is generally a question of fact, but may be decided by the court "as a matter of law when there is no conflict in the evidence." *Finch v. Farmers Co-op. Oil Co.*, 2005 WY 41, ¶ 12, 109 P.3d 537, 541 (Wyo. 2005).

[¶ 15] Mr. Kuhl contends that the letter he received from Mr. Matthews on behalf of Wells Fargo, delivered by Mr. Nations, constituted a written offer of an express contract of employment between Mr. Kuhl and Wells Fargo. He contends that he accepted the offer when he began his employment with Wells Fargo on July 1, 2008. As stated in his brief, "The unilateral contract offered to him ... was clear in its intent to offer him employment with Wells Fargo for a period of one year beginning on July 1st, 2008." In other words, Mr. Kuhl contends that he and Wells Fargo entered into an express agreement that altered the presumed at-will employment relationship.

[¶ 16] Wells Fargo concedes that it had a contract of employment with Mr. Kuhl. It disagrees with his interpretation of the contract. Wells Fargo contends that the letter is unambiguous in maintaining an at-will employment relationship between Mr. Kuhl and Wells Fargo.

[¶ 17] Details of this letter were highlighted above, but because interpretation of its language is key to resolving this claim, we will set forth here the text of that letter in its entirety. All italics and bold text are as in the original, and the font size is similar to the original.

William "Bill" Kuhl
First State Bank of Pinedale
Dear Bill:

As you know, Wells Fargo & Company ("Wells Fargo") recently announced that it had entered into an agreement to acquire First State Bank of Pinedale. We are very pleased that you will be joining the Wells Fargo team and look forward to working with you! We believe this will be a great partnership between two top notch organizations and you have an important role in the success. We are committed to retaining key employees such as you through this transition and have outlined some basic terms of your continued employment below.

We want to remind you that completion of the acquisition is subject to a number of conditions, including approval by shareholders of United Bancorporation of Wyoming (UBW) and approval by regulatory authorities, so at this point we do not know exactly if or when the acquisition will become effective, but we anticipate that it will be completed in second quarter, 2008 (the "Closing Date"). That said, we are looking forward to having you join our team on the Closing Date, but until that time we are two separate companies so please keep that in mind as we move forward with this transition.

As we previously mentioned to you, Wells Fargo believes in "People as a Competitive Advantage" ("PACA"). As a result, we again remind you that we are committed to retaining key employees such as yourself. To that end, I want to confirm that while there may be process changes as we move through the transition, you should expect it to generally be "business as usual". This means that you should continue to perform your job duties. To further demonstrate our commitment, we would like to confirm that following the Closing Date:

- Your Wells Fargo annual base salary will be equal to your First State Bank of Pinedale annual base salary on the Closing Date.

- Your guaranteed minimum Incentive Compensation for the calendar year 2008 will be 20% of your base salary at the time of payment (March 2009).

- You will be eligible for a total retention bonus of $56,000 payable in two equal payments of $28,000 each, less applicable taxes and withholdings, provided you remain continuously employed between now and the applicable retention dates (as defined below). You will earn the first retention payment if you remain employed through January 1, 2009. You will earn the second retention payment if you remain employed through July 1, 2009. These payments will be paid as soon as administratively possible following the above retention dates.

- Your qualifying service will be credited towards eligibility, participation and vesting in Wells Fargo's employee benefit plans, as well as your Paid Time off (PTO). The only exception to this will be Wells Fargo's Cash Balance Plan. On a go forward basis, you will be eligible to participate in Wells Fargo's Cash Balance Plan as a new employee under the terms of that plan.

Of course, all of this is contingent upon the successful completion of the acquisition, your continued employment with First State Bank of Pinedale through the day immediately preceding the Closing Date, and your ability to satisfy Wells Fargo's basic conditions of employment found on page 3 below.[1]

Wells Fargo is committed to providing you with timely information as it becomes available. As we get closer to the Closing Date (or shortly thereafter), we will give you more specific information about Wells Fargo including benefits information (descriptions and enrollment information), a *Handbook for Wells Fargo Team Members*, tax forms and additional paperwork necessary to welcome you to the Wells Fargo team!

Thank you in advance for your patience, continued hard work, understanding and focus on your customers and communities as we work through this exciting transition. We look forward to having you join the Wells Fargo team!

Sincerely,

/s/ Michael J. Matthews

Mike Matthews

Regional President—Wyoming

cc: Brad Nations

---

**Conditions of Employment at Wells Fargo**

Employment with Wells Fargo has no specified term or length. Both a team member and Wells Fargo have the right to terminate a team member's employment at any time, with or without advance notice and with or without cause. This is called "employment at will" and no employee of Wells Fargo has the authority to alter this arrangement without the express authorization of a Wells Fargo officer at the level of executive vice president or higher. Key values at Wells Fargo include accountability,

---

1. The parties agree that this letter did not include a page 3.

integrity, customer focus, and diversity. All Wells Fargo team members are expected to adhere to Wells Fargo's corporate policies and Wells Fargo's *Code of Ethics and Business Conduct.*

Your employment at Wells Fargo is contingent upon your ability to provide, on or before the Closing Date, documentation that verifies your identification and eligibility to work in the United States, as outlined by the Immigration Reform and Control Act of 1986.

In addition, as a federally insured institution, Wells Fargo is unable to employ:

- Individuals who have been convicted of a crime of dishonesty or breach of trust.
- Any person who does not meet our bond requirements.

Therefore, your employment is contingent upon the results of your background investigation.

And finally, if you previously worked for Wells Fargo prior to this acquisition and your employment was terminated by Wells Fargo, Wells Fargo may consider you to be ineligible for employment if the reasons for the termination involved violation of Wells Fargo's corporate policies or Wells Fargo's *Code of Ethics and Business Conduct.*

**The retention offer described in this letter is being offered to a select group of employees. As a result, it is important that you maintain the confidentiality of this offer. Please do not discuss this commitment with any person except your family members, if applicable, attorneys or tax preparer or other professional advisors to whom such disclosure is necessary to effectuate the purposes for which you consulted such professional advisors, or as required by law. You may also discuss the offer with your current immediate supervisor and Brad Nations.**

[¶ 18]  In his brief, Mr. Kuhl urges us to interpret the letter as making "a commitment to continued employment for a specified time with guaranteed incentives and longevity bonuses." He also points to language indicating that Wells Fargo was "committed to retaining key employees" as indicating that the employment relationship was not at-will. But Mr. Kuhl's interpretation is untenable given the language of the letter. The letter did not specify any period of time during which Mr. Kuhl would be employed. It stated that he would be "eligible" for a retention bonus "provided" that he remained employed by Wells Fargo until the payment dates, but this contingency cannot be interpreted as a commitment to employ him through those dates. By stating he would "earn the second retention payment *if* [he]

remain[ed] employed through July 1, 2009," the letter plainly indicated that Mr. Kuhl might or might not remain employed through the specified date.

[¶ 19]  Moreover, the letter contained language that unequivocally expressed Wells Fargo's intent to offer Mr. Kuhl employment at-will: "Employment with Wells Fargo has no specified term or length. Both a team member and Wells Fargo have the right to terminate a team member's employment at any time, with or without advance notice and with or without cause. This is called 'employment at will.'" We agree with the district court's conclusion that the plain language of the express contract of employment between Wells Fargo and Mr. Kuhl is clear and unam-

biguous in providing that Mr. Kuhl's employment would be at-will.

[¶ 20] Mr. Kuhl's position is that there is language in the letter indicating that his employment would not be at-will, so that the "employment at will" provision rendered the contract ambiguous. Because the contract is ambiguous, he continues, the Court must consider "extrinsic and parol" evidence to interpret the contract. The extrinsic and parol evidence upon which he relies includes his testimony that, when he asked Mr. Nations about the "employment at will" provision, Mr. Nations explained that the employment could be terminated only if Mr. Kuhl took illegal actions.

■ [¶ 21] For purposes of summary judgment, we are bound to accept Mr. Kuhl's version of the facts as credible. We are not bound to accept his interpretation that the contract is ambiguous. As previously discussed, there is simply no language in the letter that can reasonably be interpreted as providing that Mr. Kuhl's employment would be for any specified period of time, or that he could be terminated only for cause. Because the contract is unambiguous in providing that Mr. Kuhl's employment would be at-will, extrinsic evidence to the contrary should not be considered. "We interpret the language of an unambiguous agreement as a matter of law, and rely on extrinsic evidence only if the contract is ambiguous." *Sutherland v. Meridian Granite Co.*, 2012 WY 53, ¶ 8, 273 P.3d 1092, 1095 (Wyo.2012), citing *Union Pacific Resources Co. v. Texaco*, 882 P.2d 212, 219–20 (Wyo.1994).

■ [¶ 22] Mr. Kuhl further contends that Mr. Nations' response altered the offer of employment contained in the letter, effectively negating its language and turning it into an employment contract other than at-will. However, the letter explicitly provided that "no employee of Wells Fargo has the authority to alter this arrangement without the express authorization of a Wells Fargo

officer at the level of executive vice president or higher." It is undisputed that Mr. Nations, the human resources manager, was not at the level of executive vice president or higher. Mr. Matthews, who signed the letter as "Regional President—Wyoming," was not an executive vice president or higher at the time Mr. Kuhl received this letter.[2] Accordingly, they lacked authority to modify Mr. Kuhl's at-will employment status.

[¶ 23] The written employment contract between Wells Fargo and Mr. Kuhl unambiguously provided that his employment was at-will. It was not modified orally by Mr. Nations or Mr. Matthews. We therefore conclude that the district court did not err in granting summary judgment in Wells Fargo's favor.

### *Implied Contract*

■ [¶ 24] Mr. Kuhl also contends, "in the alternative, that the *Wells Fargo Team Members Handbook* ... which contains no prominent, conspicuous and an [sic] unambiguous disclaimer of any contractual intent, constitutes an implied contract of employment which could be terminated only for cause." Wyoming's established precedent regarding employee handbooks is summarized in the following passage:

In Wyoming, employment at will permits either party to terminate a contract of employment, which is for an indefinite duration, at any time, for any reason or for no reason at all. *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, [217] (Wyo.1994); *Lankford v. True Ranches, Inc.*, 822 P.2d 868, 872 (Wyo.1991). However, in *Mobil Coal Producing, Inc. v. Parks*, 704 P.2d 702, 706–07 (Wyo.1985), we found that an employee handbook or personnel manual may supply terms for an implied in fact contract of employment. *See Wilder*, 868 P.2d at [217] (discussing enforceability of an implied in fact contract of employment). In particular, a systematic discipline procedure or other language

---

2. Mr. Matthews was apparently promoted to the level of executive vice president on or about the closing date. He was, therefore, an executive vice president when his deposition was taken in this case. That led to some confusion, depending on whether the question was "What *is* your position" or "What *was* your position?" Mr. Matthews later clarified that he was an executive vice president at the time of his deposition, but not at the time Mr. Kuhl received the letter. Accordingly, his job title does not present a genuine issue of material fact.

in an employee handbook implying termination may be for cause only may defeat the rebuttable presumption that employment is at will. *Sanchez v. Life Care Centers of America, Inc.*, 855 P.2d 1256, 1257 (Wyo.1993).

Employers do have a means to avoid formation of an implied in fact contract of employment while still presenting the employee with useful information about required performance on the job. The employment at will presumption of Wyoming law may be sustained when unambiguous language disclaiming the formation of a contract is sufficiently conspicuous and present in documents that would otherwise comprise terms of an implied in fact contract of employment. *Sanchez*, 855 P.2d at 1259; *McDonald v. Mobil Coal Producing, Inc.*, 820 P.2d 986, 988 (Wyo.1991) (*McDonald II*).

When properly drafted, a sufficient disclaimer constitutes an express statement in the employment application and subsequent relevant documents, such as an employee handbook, that places the employee on notice that general statements or conduct do not promise employment security and are not to be relied upon by the employee. 1 Henry H. Perritt, Jr., *Employee Dismissal Law and Practice* § 4.25 at 310 (3rd ed. 1992). A conspicuous and unambiguous disclaimer would then make any reliance on the subsequent statements of the employer unreasonable.

*Lincoln v. Wackenhut Corp.*, 867 P.2d 701, 703 (Wyo.1994).

[¶ 25] Mr. Kuhl contends that the provisions regarding performance evaluations, the comprehensive description of prohibited conduct, and the systematic discipline procedure, all contain language implying that the employment relationship is not at-will, but terminable only for cause. He compares his employee handbook to the one in *Mobil Coal Producing, Inc. v. Parks,* 704 P.2d 702, 705–06 (Wyo.1985), which contained a list of "rules of unacceptable conduct" that could lead to discipline, including termination. In that case, we affirmed the district court's ruling that the list of causes for termination implied that cause was necessary for termi-

nation. The handbook also outlined a "policy of progressive discipline tempered by the seriousness of the offense," and we agreed with the district court that this implied a commitment by the employer to follow the specified steps in disciplining an employee. "Not only does the tenor of the foregoing reflect the necessity for the existence of cause for discharge," we said, "but it specifically requires such.... The handbook's provisions change the [employer's] unfettered right to discharge [an employee] at any time and without cause." *Id.* at 705–07.

[¶ 26] Recognizing that the language contained in employee handbooks may vary widely, we have said that

Each case must be considered on its own merits. Some handbooks or manuals may not contain provisions which negate the employment at will. Some handbooks or manuals may be ambiguous or may not have apparent meaning, making the determination of their effect on at will employment a question of fact. Normally, the construction and interpretation of a contract is for the court as a matter of law. *Rouse v. Munroe,* Wyo., 658 P.2d 74, 77 (1983); *Amoco Production Company v. Stauffer Chemical Company of Wyoming,* Wyo., 612 P.2d 463, 465 (1980). If the meaning of a contract is ambiguous or not apparent, it may be necessary to determine the intention of the parties from evidence other than the contract itself, and interpretation becomes a mixed question of law and fact. *Goodman v. Kelly,* Wyo., 390 P.2d 244, 247 (1964).

*Id.* at 706.

[¶ 27] With that in mind, we note that the Wells Fargo handbook provided to Mr. Kuhl contains language plainly intended to preserve the employment at-will relationship. Chapter 4 of the handbook outlines levels of performance counseling and corrective actions, but also expressly specifies:

**However, the policy is not progressive.** This means that we reserve the right to escalate the process or use any part of it that we feel is appropriate for the situation—and, if necessary, to terminate employment without implementing performance counseling and corrective action.

This is consistent with our "employment at will" policy below.

(Bold in original.) Chapter 9 contains a list of actions that may lead to termination, but also specifies that an employee may be terminated if his "continued employment is considered to be no longer in the best interest of Wells Fargo." Unlike the handbook in *Mobil*, the language of the Wells Fargo handbook does not unambiguously suggest that cause is required for termination, or that Wells Fargo is committed to a progressive disciplinary procedure before an employee's employment may be terminated.

[¶ 28] Also unlike *Mobil*, the Wells Fargo handbook includes disclaimers. As we have explained many times, a conspicuous and unambiguous disclaimer serves to preserve the employment at-will relationship, because it provides the employee with notice that the general statements in the handbook are not to be relied upon as contractual obligations. *E.g., Lincoln*, 867 P.2d at 704. The Wells Fargo handbook contains at least four disclaimers, quoted in paragraphs 10 and 11 above. These are plain and unambiguous expressions of Wells Fargo's intent to maintain the employment at-will relationship.

[¶ 29] Mr. Kuhl contends, however, that the disclaimers are not sufficiently conspicuous to prevent the formation of an implied employment contract. He points out that, in *Lincoln*, 867 P.2d at 704–05, we concluded that a disclaimer was sufficiently conspicuous because the text was prominent ("The lettering is approximately twice the size of the lettering used for the remaining text . . . in bold print and . . . capitalized."), and because it was placed where it would be noticed by a reasonable person (It was "on the first interior page" of the handbook.). Mr. Kuhl correctly points out that the disclaimers in the Wells Fargo handbook are not capitalized or in bold print, and they are not in larger lettering than the other provisions of the handbook. For these reasons, he contends that the disclaimers were ineffective in preventing the implication of an employment contract.

[¶ 30] Wells Fargo counters that a disclaimer is placed as the very first paragraph of its handbook. In addition, disclaimers are repeated in Chapters 4 and 9, the same chapters relied upon by Mr. Kuhl as creating an implied contract of employment. Wells Fargo also points out that the disclaimers are contained in "separate and distinct paragraphs with bold headings." Moreover, Wells Fargo contends, the disclaimers are made conspicuous by the frequency of their repetition.

[¶ 31] As previously noted, there are at least four disclaimers contained in the handbook itself. Similar disclaimers are also found in the letter offering Mr. Kuhl employment with Wells Fargo, in the Wells Fargo Acquisition Eligibility Form, in the Wells Fargo Agreement Regarding Trade Secrets, in the Team Member Acknowledgement in which Mr. Kuhl acknowledged receipt of the handbook, and in the letter Mr. Kuhl received from Wells Fargo approximately one month before the closing date. Even though the disclaimers are not in larger print or bold lettering, the district court concluded that the "at-will disclaimers in the employment documents are unquestionably conspicuous by virtue of repetition, prominence, and placement." We agree with the district court.

[¶ 32] In addition, it is undisputed that Mr. Kuhl had actual knowledge of the disclaimer provisions. This makes his case similar to *Andrews v. Southwest Wyo. Rehabilitation Ctr.*, 974 P.2d 948, 952 (Wyo.1999), in which we wrote,

Andrews acknowledges that the revised handbook contains a disclaimer, but argues that it is invalid because it is not conspicuous. A conspicuous disclaimer maintains the at-will relationship because it puts the employee on notice that general statements or conduct do not promise employment security and are not to be relied upon by the employee. *Lincoln*, 867 P.2d at 703. An employee cannot reasonably rely on the conduct or statements of an employer if he has been sufficiently informed that his employment is at will. *Id.* As a general rule, this court considers the prominence, placement and language of a disclaimer to determine if it is conspicuous and unambiguous as a matter of law. *Id.* However, whether the disclaimers in

SWRC's handbook were placed on the first page, or were bold or highlighted to draw an employee's attention, is irrelevant under the facts of this case. Andrews testified during his deposition that he was the primary author of the revised handbook. Therefore, he had actual knowledge of the at-will provisions in the handbook. Those provisions, outlined above, are unambiguous and plainly demonstrate SWRC's intent to maintain the at-will status of its employees. Accordingly, Andrews could not reasonably believe that the handbook promised job security.

(Footnote omitted.) In opposition to Wells Fargo's motion for summary judgment, Mr. Kuhl submitted an affidavit stating that he had "read about the employment-at-will policies" in the handbook. It is therefore undisputed that he had actual knowledge of the at-will disclaimers. Mr. Kuhl testified in his deposition that he understood at-will employment to mean that "an employer can terminate the employment of an employee at any time for any reason or for no reason and, likewise, an employee could ... leave the employment of the employer at any time for any reason or no reason." Because he read and understood the disclaimers, Mr. Kuhl cannot reasonably claim that the Wells Fargo handbook created an implied contract modifying his status as an at-will employee. The district court did not err in granting summary judgment in favor of Wells Fargo on Mr. Kuhl's claim of an implied contract of employment.

### Promissory Estoppel

[¶ 33] The same disclaimers that prevented the formation of an implied contract of employment between Wells Fargo and Mr. Kuhl also preclude his claim of promissory estoppel. One of the required elements of a promissory estoppel claim is "proof that the party urging the doctrine acted to its detriment in reasonable reliance" on a promise or agreement. *Worley v. Wyoming Bottling Co., Inc.,* 1 P.3d 615, 623 (Wyo.2000).

A valid at-will employment disclaimer, however, defeats an employee's promissory estoppel claim. *Trabing [v. Kinko's, Inc.,* 2002 WY 171,] ¶ 22[, 57 P.3d 1248, 1255

(Wyo.2002) ]. The existence of a disclaimer "makes it unreasonable for an employee to rely on any subsequent understanding that [his] employment would be anything other than at will." *Id.* In other words, a valid disclaimer prevents the employee from satisfying the second element of a promissory estoppel claim. *Id. See also, Honorable [v. American Wyott Corp.],* 11 P.3d [928,] 931 [ (Wyo.2000) ].

*Finch,* ¶ 23, 109 P.3d at 544. *See also Worley,* 1 P.3d at 624; *Bouwens v. Centrilift,* 974 P.2d 941, 947 (Wyo.1999); *Davis v. Wyoming Medical Center, Inc.,* 934 P.2d 1246, 1252 (Wyo.1997); *Loghry v. Unicover Corp.,* 927 P.2d 706, 711 (Wyo.1996).

[¶ 34] As previously discussed, the disclaimers found in the Wells Fargo handbook and various other employment-related documents unambiguously and repeatedly expressed Wells Fargo's intention to maintain an at-will employment relationship with Mr. Kuhl. It is undisputed that he read and understood the disclaimers. These disclaimers preclude him from showing the reasonableness of his reliance on any promise to modify the at-will relationship. "Because of the specific disclaimer language, promissory estoppel is not available." *Davis,* 934 P.2d at 1252. The district court did not err in granting summary judgment in favor of Wells Fargo on Mr. Kuhl's promissory estoppel claim.

### Implied Covenant of Good Faith and Fair Dealing

[¶ 35] Mr. Kuhl also presented a claim for breach of the implied covenant of good faith and fair dealing. "[A]ll contracts of employment contain an implied covenant of good faith and fair dealing." *Wilder,* 868 P.2d at 220. However,

although a duty of good faith and fair dealing is created by law in all cases, it is only in *rare and exceptional* cases that the duty is of such a nature as to give rise to tort liability. The kind of breach of duty that brings into play the bad faith tort arises only when there are *special relationships* between the tort-victim and the tort-feasor.

*K Mart Corp. v. Ponsock,* 103 Nev. 39, 732 P.2d 1364, 1370 (1987) (emphasis added). The special relationship necessary to permit recovery is not established merely by the employer-employee relationship. A showing is required that a special relationship of trust and reliance exists between the particular employee seeking recovery and the employer. *Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 443, 168 Cal. Rptr. 722, 729 (1980); *K Mart Corp.,* 732 P.2d at 1372. Trust and reliance may be found by the existence of separate consideration, common law, statutory rights, or rights accruing with longevity of service. *Cleary,* 168 Cal.Rptr. at 729.

*Wilder,* 868 P.2d at 221. "Whether a special relationship exists is a question of fact, not a question of law, and is to be decided by the trier of fact unless reasonable minds could not differ." *Worley,* 1 P.3d at 624.

[¶ 36] Even viewing the facts in Mr. Kuhl's favor, reasonable minds could not differ in concluding that there was no special relationship between Mr. Kuhl and Wells Fargo. At the district court level, Mr. Kuhl presented no facts or argument to support the existence of separate consideration, common law, or statutory rights sufficient to demonstrate a special relationship.[3] As to longevity of service, we have discussed two examples in which a special employment relationship was shown:

> *Wilder* first cited *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251, 1255–58 (Mass.1977), where a twenty-five year employee was fired to avoid paying bonuses due him on a large sale he had just completed. 868 P.2d at 220–21. The second example found in *Wilder* was the Nevada case of *K Mart Corp. v. Ponsock,* 732 P.2d at 1366, where a nine and a half year contract employee was fired, for trivial reasons, six months prior to the time his pension was scheduled to fully vest. As *Wilder* teaches, in order to establish that the implied covenant has been breached, most commonly the employee must have been terminated to avoid payment of commissions or benefits already earned, or to avoid payment of benefits scheduled to arise or vest in the near future.

*Worley,* 1 P.3d at 627 (footnote omitted).

[¶ 37] Mr. Kuhl's employment with Wells Fargo was terminated on December 10, 2008, less than a month before he was eligible to receive a retention bonus of $28,000. Viewed in a light most favorable to Mr. Kuhl, this fact could indicate that Wells Fargo terminated his employment in order to avoid the payment of this retention bonus. It is undisputed, however, that Mr. Kuhl was employed by Wells Fargo for only five months and ten days. "We are aware . . . of no case in which such a special relationship has ripened over a period of mere months." *Garcia v. UniWyo Fed. Credit Union,* 920 P.2d 642, 646 (Wyo. 1996). Mr. Kuhl's brief tenure at Wells Fargo was insufficient to establish the sort of special relationship needed to sustain a tort claim of breach of the implied covenant of good faith and fair dealing. *Compare Trabing,* ¶ 26, 57 P.3d at 1256 (Eight years of service did not create "the special relationship necessary to sustain this type of claim."); *Terry v. Pioneer Press, Inc.,* 947 P.2d 273, 277–78 (Wyo.1997) (Six years was not enough to establish the existence of a special relationship.); *Wilder,* 868 P.2d at 222 (Three years employment was insufficient to create a special relationship.).

[¶ 38] In the absence of a special employment relationship, Mr. Kuhl cannot maintain a tort action against Wells Fargo for breach of the implied covenant of good faith and fair dealing. The district court did not err in granting summary judgment in favor of Wells Fargo on this claim, or on any of Mr. Kuhl's other claims.

[¶ 39] Affirmed.

---

3. Because these were not raised as issues before the district court, we do not need to consider them on appeal. *Union Pacific R.R. Co. v. Caballo Coal Co.,* 2011 WY 24, ¶ 22, 246 P.3d 867, 873 (Wyo.2011) (We do not consider "arguments that were not raised in, or argued to, the district court unless they are fundamental or jurisdictional in nature.").