FILED
United States Court of Appeals
Tenth Circuit

January 9, 2017

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STEVEN JOHNSTON,

     Plaintiff - Appellant,

v.

MINI MART, INC., d/b/a Loaf 'N Jug,

     Defendant - Appellee.

No. 16-8025
(D.C. No. 2:15-CV-00069-SWS)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **HOLMES**, and **MORITZ**, Circuit Judges.
_____

In this age discrimination case, Steven Johnston appeals from a district court order

granting summary judgment in favor of his employer, Mini Mart, Inc., d/b/a Loaf 'N Jug

(LNJ). Exercising jurisdiction under 28 U.S.C. 1291, we affirm.

**BACKGROUND**

Johnston began working for LNJ in 1986. He eventually became a district

advisor, overseeing twelve LNJ convenience stores primarily in Wyoming. As a district

advisor, Johnston was responsible for "[e]nsur[ing] that all stores . . . provid[e] the

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

customer service that meets or exceeds Company standards and customer expectations," "[m]aintain[ing] high standards of store image ensuring that all stores are clean, well stocked and ready for business," and "[e]nsur[ing] that all assigned stores operate within established inventory levels, salary budgets . . . and gross profit margins to achieve maximum profitability." Aplt. App., Vol. I at 30.

Nancy Riggs supervised Johnston from 2010 to August 2012. In March 2012, Riggs reviewed Johnston's 2011 performance, giving him a "Meets Expectations" rating. Aplee. Supp. App., Vol. II at 75. Riggs indicated that Johnston's 2011 results were "very excellent," but that based on unannounced store visits, his results didn't always "reflect the true picture in some locations . . . [as] [s]tore conditions need[ed] to be maintained at their highest standards at all times." *Id.* at 71.

A few months later, Riggs and LNJ's division president conducted a tour of Johnston's stores. Conditions in one store were "so bad that [the president] walked out the door." *Id.* at 67. Afterward, Riggs emailed Johnston, telling him that some of his stores "were very disappointing" and that the division president wanted the problems corrected. Aplt. App., Vol. I at 52. Riggs directed Johnston "to come up with a plan that this is going to change," and she reminded him that "we are not a mom and pop company anymore and we need to . . . keep[ ] our stores as consistent as possible." *Id.* at 53. Finally, she warned him that "[t]he next step if not corrected is a permanent performance warning." *Id.*

Bradley Wynn took over Riggs' supervisory role in August 2012. In September, after visiting several stores in Johnston's district, Wynn emailed Johnston, identifying

2

various problems. For instance, Wynn noted that Johnston's district had the highest "shrink rate"—i.e, inventory losses due to theft and spoilage. Further, Johnston's stores had received lower than desired "mystery shopper" scores, which concern shopper satisfaction, and BARS scores, which concern alcohol/tobacco sales to minors.

In October, Wynn again visited stores and notified Johnston of common problems: "Food Service focus lacking (Grill presentations poor)"; "No Greetings offered at the majority of stores visited"; "Coolers not to plan-o-grams"; "High number of out of stocks"; and "Coffee bars in need of cleaning." Aplee. Supp. App., Vol. I at 47.

In November, Wynn provided feedback from more store visits. He noted improvement in one store, but the same or worse conditions in two other stores. Nevertheless, Johnston received a fourth quarter performance bonus.

In January 2013, Wynn gave Johnston a "performance correction notice," directing Johnston to act to raise his stores' BARS and mystery shopper scores, reduce shrink rate, and improve store appearance. *Id.*, Vol. I at 32. The notice indicated that Johnston's next disciplinary step would be a "Final Written Warning." *Id.* at 33. Several days later, Johnston emailed his store managers, telling them, "we are under a microscope" because "it's been a terrible year for" shrink rates, mystery shopper scores, and BARS scores. Aplee. Supp. App., Vol. II at 93. He urged his managers to "turn these areas around." *Id.* Nevertheless, in February Wynn noted "a consistent theme across all of [Johnston's] stores that a deep cleaning was still needed on the floors around equipment and the coffee condiment centers," *id.*, Vol. I at 53, and "minimal progress overall" since January, *id.*, Vol. II at 56.

3

In March, Wynn gave Johnston his performance evaluation for the 2012 fiscal year. He rated Johnston in the "Does Not Meet Expectations" category, which describes an employee who "[n]eeds immediate, significant and sustained performance improvements." Aplt. App., Vol. I at 36. Regarding his BARS and mystery shopper scores, Johnston commented on the evaluation form, "[a] frustrating year after the great 2011." *Id.* at 34.

On April 12, Wynn gave Johnston a final performance correction notice. In it, Wynn warned Johnston he would face termination of his employment if by May 14 he did not improve his stores' BARS score to 95% (from 81%); mystery shopper score to 96% (from 93%); shrink rate to 1.25% (from 1.05%); and store appearance to "optimal conditions." *Id.* at 38.

By May 1, however, Wynn was convinced that Johnston wasn't fully committed to achieving those scores. Wynn perceived that "[t]he retailing conditions had gotten worse," and he had received a report of serious cleanliness problems at a Subway restaurant in Johnston's store #195. Aplee. Supp. App., Vol. I at 39. Consequently, Wynn consulted with Riggs and terminated Johnston based on mystery shopper scores, shrink rate, BARS scores, and store conditions. At the time, Johnston was 63 years old. He was replaced by an employee in her mid-40s.

Afterward, Johnston filed a charge of age discrimination with the Wyoming Department of Workforce Services Fair Employment Program (WFEP). That agency issued a probable cause finding of discrimination. Johnston then sued LNJ in federal court, claiming (1) violation of the Age Discrimination in Employment Act (ADEA),

4

29 U.S.C. §§ 621-34; (2) breach of the implied covenant of good faith and fair dealing; and (3) breach of contract.

The district court granted LNJ's summary judgment motion on all of Johnston's claims. Specifically, as to the ADEA claim, the district court applied the familiar *McDonnell Douglas* burden-shifting framework,[1] and advanced to the pretext step, as LNJ didn't contest Johnston's showing of a prima facie case and LNJ had articulated a legitimate, non-discriminatory reason for terminating his employment—poor performance. The district court concluded that Johnson had failed to present evidence to support a finding of pretext, or that but for his age, he would not have been terminated. And the court found that Johnston's good-faith-and-fair-dealing claim failed because Johnston had not proved the requisite special employer-employee relationship. Finally, the court concluded that given Johnston's at-will employee status, his breach of contract claim also failed.

## DISCUSSION

### I. Summary Judgment Standards

We review summary judgment orders de novo. *Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[1] Under this framework, if the plaintiff establishes a prima facie case of discrimination, the employer must articulate some legitimate, nondiscriminatory reason for its action, and if it does so, the plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011).

as a matter of law." Fed. R. Civ. P. 56(a). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Ribeau*, 681 F.3d at 1194 (internal quotation marks omitted).

## II. Age Discrimination

The ADEA makes it unlawful for an employer "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). ADEA protection extends to individuals who are 40 years of age or older. *Id.* § 631(a).

To succeed under the ADEA, an employee must show by a preponderance of the evidence that "age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009). In other words, the employee's age must have been "the factor that made a difference" in the employer's decision. *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1277-78 (10th Cir. 2010). This causal link "must be based on more than mere speculation, conjecture, or surmise." *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (internal quotation marks omitted).

Like the district court, we proceed without objection to the pretext step of the *McDonnell Douglas* framework.

> Our relevant inquiry for determining pretext is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination. In making this determination we look at the facts as they appear to the person making the decision to terminate.

6

*Simmons v. Sykes Enters.*, 647 F.3d 943, 947-48 (10th Cir. 2011) (citation and internal quotation marks omitted).

Preliminarily, Johnston argues that the district court employed an incorrect legal standard. He appears to conclude that since the district court granted LNJ summary judgment despite his evidence, the court must have utilized the now defunct pretext-plus standard. *See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1312 (10th Cir. 2005) ("Under pretext-plus, the plaintiff must do more than show pretext; he must also come forward with additional, direct evidence of a discriminatory motive." (internal quotation marks omitted)). We disagree. The district court cited and applied the proper standards of review, requiring Johnston to "create[ ] a genuine issue of fact merely by discrediting [LNJ's] legitimate, nondiscriminatory reason," *id.* As discussed below, Johnston simply failed to carry his burden.

To show that LNJ's poor-performance justification is pretext, Johnston claims "that from 2009 to 2011, [he] improved in every quantifiable category." Aplt. Opening Br. at 12. But abundant evidence demonstrates that Johnston's performance issues began in 2012, not long after his 2011 performance review. And we have held that "changes in an employer's estimation of its employee's job performance, without more, cannot establish pretext as a matter of law." *Roberts v. Int'l Bus. Machs.*, 733 F.3d 1306, 1309 (10th Cir. 2013) (noting that the quality of an employee's job performance "is itself capable of change and an employer isn't prohibited from acting on honestly held beliefs about those changes").

7

Next, Johnston argues that Wynn decided to terminate his employment on May 1 by mistakenly relying on scores that preceded the April 12, 2013, final notice, despite the fact that Johnston's scores had improved by May 1.[2] But "[e]vidence that the employer shouldn't have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Simmons*, 647 F.3d at 948 (internal quotation marks omitted).

Nevertheless, relying on segments of Wynn's deposition testimony, Johnston suggests that Wynn was aware of his improved scores at the time Wynn terminated his employment. But Wynn's testimony on that subject is both confusing and contradictory. At one point, Wynn testified that on May 1, he "didn't know what [Johnston's] scores were for . . . the time of his termination," as they weren't yet "available." Aplt. App., Vol. II at 94. At a later point in the deposition, Wynn testified that he "would have known" on May 1 if Johnston's scores had improved. *Id.* at 95. Yet Wynn didn't explain this seemingly contradictory testimony, nor was he asked to do so, as far as we can see.

Moreover, Wynn clearly testified that he evaluated the conditions in Johnston's stores based on his "visits to [the] stores," and his fear that LNJ would lose the Subway franchise in store #195 due to food-safety concerns. *Id.* at 95. Further, both Riggs and Wynn documented numerous issues with store conditions. And significantly, when they brought those issues to Johnston's attention, he not only didn't dispute them, he conceded

---

[2] The record is unclear as to the exact scores Johnston had attained by the date of his termination.

8

that 2012 had "been a terrible year," Aplee. Supp. App., Vol. II at 93, and "[a] frustrating year," Aplt. App., Vol. I at 34.

Under these circumstances, we conclude Wynn's ambiguous statements do not materially impact our critical inquiry—whether Wynn honestly held his belief in Johnston's poor performance. *See Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1268 (10th Cir. 2015) ("[W]e do not ask whether an employer's decisions were wise or fair; we ask only whether the employer honestly believed its reasons and acted in good faith upon them." (internal quotation marks omitted)).

Next, Johnston points out that the WFEP found probable cause of discrimination and that an LNJ human resources representative agreed with that finding. But an employment agency's discrimination finding does not by itself create a genuine issue of material fact as to pretext. *See Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1331 (10th Cir. 1999), *abrogated in part on other grounds by Eisenhower v. Weber Cty.*, 744 F.3d 1220, 1227 (10th Cir. 2014).

Moreover, it is unclear what evidence the WFEP relied upon in finding probable cause. The WFEP appears to have based its finding, at least in part, on Johnston's performance from 2007 to March 2012—evidence we find immaterial given that Johnston's performance issues developed after that time period. And the WFEP simply rejected the performance issues identified and documented during Riggs' and Wynn's store visits. Moreover, while the WFEP cited Johnston's receipt of a performance bonus for the November 2012 to January 2013 period, the record reflects that this bonus was based partly on gasoline sales and a profitability metric, neither of which relates to the

9

particular performance issues Riggs and Wynn identified. In short, we reject Johnston's attempt to create a triable pretext issue based on the WFEP's finding or the human resources representative's agreement with that finding. *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1237-38 (10th Cir. 2015) (rejecting the "speculative nature of [the plaintiff's] pretext theories").

Finally, Johnston argues that he has shown pretext by the fact that "every District Advisor terminated by Bradley Wynn has been in the protected age group." Aplt. Opening Br. at 22. Implicitly, Johnston argues that Wynn doesn't fire advisors who are outside the protected age group. Aplt. Opening Br. at 22. But this argument also fails as Johnston doesn't point to any evidence that Wynn evaluated younger district advisors differently or that younger advisors failed to comply with performance standards to the same extent he did. *See Roberts*, 733 F.3d at 1310 (noting that evidence that a similarly situated employee received better treatment can suggest pretext, but that the other employee must, in fact, be similarly situated—"that is, reporting to the same supervisor, held to the same standards, and afoul of those standards to at least the same degree") (citation omitted). The bottom line is that the employee alleging discrimination has the burden to rule out alternative explanations for the differential treatment, *id.,* and Johnston fails to do so here. In contrast, LNJ identified evidence showing that Wynn promoted a sixty-one-year-old district advisor to central regional manager.[3]

---

[3] To the extent Johnston attempts to establish pretext on the basis that Riggs and Wynn are younger than he, this argument also fails. First, Riggs, who has since been promoted to senior vice president at LNJ's sister company, Quik Stop, Inc., is only six years younger than Johnston (and thus within the protected age group). Second, we

We conclude that Johnston failed to raise a genuine issue of material fact as to pretext and the district court properly entered summary judgment in favor of LNJ on Johnston's ADEA claim.

### III. Good Faith and Fair Dealing

Johnston also challenges the district court's entry of summary judgment in favor of LNJ on his claim of breach of an implied covenant of good faith and fair dealing. Under Wyoming law, "[a]ll contracts of employment contain an implied covenant of good faith and fair dealing." *Kuhl v. Wells Fargo Bank, N.A.*, 281 P.3d 716, 727 (Wyo. 2012) (internal quotation marks omitted). But "it is only in rare and exceptional cases that the duty is of such a nature as to give rise to tort liability." *Id.* (emphasis and internal quotation marks omitted). Specifically, to give rise to tort liability the employee must show "a special relationship of trust and reliance . . . between the particular employee seeking recovery and the employer," as shown "by the existence of separate consideration, common law, statutory rights, or rights accruing with longevity of service." *Id.* at 728 (internal quotation marks omitted).

Johnston contends he established a special relationship here because LNJ fired him "to avoid the expense of an older employee." Aplt. Opening Br. at 38. But mere "longevity of service" is insufficient by itself to establish a special relationship. Instead, the plaintiff must show a "terminat[ion] to avoid payment of commissions or benefits already earned, or to avoid payment of benefits scheduled to arise or vest in the near

decline to infer discriminatory animus from the mere fact that a younger supervisor took disciplinary action against an older worker.

11

future." *Kuhl*, 281 P.3d at 728.  Johnston doesn't identify any such evidence here.  And as the district court observed, Johnston's entitlement to increased vacation time as a consequence of being a long-term employee "is simply a normal benefit that accrues to every employee and not the type of lost benefit this cause of action was meant to remedy."  Aplt. App., Vol. III at 160.

The district court properly entered summary judgment for LNJ on Johnston's good faith and fair dealing claim.

## IV.  Breach of Contract

Finally, Johnston challenges the district court's entry of summary judgment in favor of LNJ on his breach of contract claim.

Johnston recognizes that in Wyoming, the employment relationship is generally presumed to be at-will, meaning that "either the employer or the employee may terminate the relationship at any time, for any reason or for no reason at all."  *Kuhl*, 281 P.3d at 720-21.  Nevertheless, he attempts to defeat that presumption on three grounds.

First, Johnston contends that "certain personnel policies and procedures . . . requir[ed] [LNJ] to terminate employees only for good cause in accordance with the progressive disciplinary procedure in the policies."  Aplt. Opening Br. at 24.  But he fails to identify those policies and procedures, and we will not craft arguments for him. *New Mexico v. Trujillo*, 813 F.3d 1308, 1320 (10th Cir. 2016).  Moreover, we note that LNJ's employment manual contains clear and conspicuous language sustaining the presumption of at-will employment:  "Regardless of any possible discipline or Separation procedures, the employment relationship between [LNJ] and its employees is such that either the

12

employees or [LNJ] may terminate the employment relationship at any time for any reason." Aplt. App., Vol. I at 40. *See Lincoln v. Wackenhut Corp.*, 867 P.2d 701, 703 (Wyo. 1994) (finding similar language to be "a conspicuous and unambiguous disclaimer" that provided "sufficient notice to a reasonable person that no terms were stated for an implied in fact contract of employment").

Second, Johnston advances the novel argument that he could be terminated only for cause because he was initially hired in Montana, "which is a 'for cause' state" pursuant to Mont. Code Ann. § 39-2-904(1)(b) , and then later transferred to Wyoming. Aplt. Opening Br. at 30. At the very least, this argument fails because Johnston failed to plead a claim under that statute, which is "the exclusive remedy for a wrongful discharge from employment" under Montana law, Mont. Code Ann. § 39-2-902.

Third, Johnston asserts that the April 12, 2013, final performance correction notice constituted an express contract that LNJ breached when Wynn fired him before the stated correction deadline of May 14. We disagree. The notice "require[d] immediate correction," Aplt. App., Vol I at 38, and it lacked any language explicitly promising job security, *see Worley v. Wyo. Bottling Co.,* 1 P.3d 615, 622 (Wyo. 2000).

The district court properly entered summary judgment on Johnston's breach of contract claim.

## CONCLUSION

The judgment of the district court is affirmed.

Entered for the Court


Nancy L. Moritz
Circuit Judge