Abraham MOHAMMED,
Plaintiff-Appellant,

v.

Howard H. CALLAWAY, Secretary,
United States Department of the
Army, Defendant-Appellee.

No. 80–2049.

United States Court of Appeals,
Tenth Circuit.

Jan. 11, 1983.

Virginius Dabney of Dabney & Dabney, Salt Lake City, Utah, for plaintiff-appellant.

Lawrence Leigh, Asst. U.S. Atty., Salt Lake City, Utah (Ronald L. Rencher, U.S. Atty., and Wallace Boyack, Asst. U.S. Atty., Salt Lake City, Utah, on the brief), for defendant-appellee.

Before SETH, Chief Judge, and LOGAN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Abraham Mohammed brought this action against the Department of the Army alleging discrimination based on national origin in violation of Title VII, 42 U.S.C. §§ 2000e to 2000e–17 (1976). After a bench trial, the district court concluded that no illegal discrimination had occurred. On appeal Mohammed contends that: (1) the court improperly formulated the elements of a prima facie case of discriminatory failure to promote; and (2) the court's finding of no discrimination is clearly erroneous. We agree with Mohammed on both issues and therefore reverse the judgment rendered below.

Mohammed is a United States citizen of Mexican-Pakistani origin (officially classified as a Hispanic minority) and a civilian employee at the United States Army Dugway Proving Ground in Utah. He has been a professional engineer with the Army since 1960. His last promotion, approximately thirteen years prior to trial, was to the GS–12 grade level. Mohammed holds a bachelor's degree in mechanical engineering from Arizona State University. At the time of the alleged discriminatory acts, he had also completed over half of the requirements toward a master's degree in engineering, which he subsequently obtained.

In the fall of 1972, a competitive job announcement was posted for the position of Supervisory General Engineer, GS–0801–13. Mohammed applied for the position and was interviewed by an ad hoc committee. During the interview, one of the committee

members asked Mohammed how he felt "about coming into the organization being an outsider." Rec., vol. IV, at 24–25. The executive officer interceded, stating that the question was not valid. Recruitment for the position was subsequently cancelled on January 11, 1973.

In July 1973, a job opportunity announcement was issued for Supervisory General Engineer, GS–0801–12 (with promotion potential). The position was for Chief of the Munitions Branch. The previous Chief of Munitions, Phillip Miller, had been temporarily transferred to work on a suppressive shielding project in January 1973. Miller was permanently transferred to the project in July 1973. While Miller was unavailable between January and July, James Dyer, a non-minority, "took a very active role" in the office of the Chief of the Munitions Branch. Rec., vol. IV, at 143. After the position officially became vacant in July, Dyer was assigned temporarily to the position by William Harmon, the person responsible for selecting a permanent replacement.

Following the job announcement, Harmon received a list of four candidates considered by the Department of Civilian Personnel to be qualified to fill the position. Included in the list were Mohammed and Dyer. Although the job announcement stated that the candidates would be "ranked by an ad hoc committee as to best qualified," Rec., vol. III, Pl.Ex. 4, Harmon

selected Dyer solely on the basis of his review of the personnel files without either convening an ad hoc committee or interviewing the candidates.

Dyer had begun his civilian Army employment in the Munitions Branch in 1967. He held a degree in physics from Henderson State Teachers College (now Henderson State University) in Arkansas. He had been a technical adviser with virtually no supervisory experience and no experience at grade level GS–12. Harmon testified that he chose Dyer because "Dyer's experience, education, ability, dedication, and enthusiasm made him the best qualified of all eligible candidates." Rec., vol. IV, at 304. At that time, Mohammed was Chief of Engineering in the Facilities Division.

The pre-trial fact stipulations establish the following additional information. The position in dispute historically had been a grade level GS–13, but was downgraded to GS–12 when it officially became vacant in July 1973.[1] Of the four finalists for the position, Mohammed and two others could have qualified even had the job remained at a GS–13 level. Dyer, however, could not have qualified for the position if it had not been downgraded[2] because his grade level (GS–11) would have precluded him from consideration. Moreover, at the time of his selection, Dyer was not holding and had. never held a *supervisory* position by Civil Service job title classification, nor had he ever applied for or held a position in the

[1]. Both Mohammed and Boyd Blanthorn, another applicant, testified they believed the position that was posted and then cancelled in the fall of 1972 was the same position that Phillip Miller subsequently vacated temporarily in January 1973 and then permanently in July 1973. The job was to have been in range operations in the same building where Miller was located. Moreover, according to Blanthorn there were only two supervisory general engineers in range operations and his boss held one of the positions, so it was assumed that Miller's job was the one in question. Although William Harmon, who had supervisory authority over the position, testified that "to the best of his memory" he did not believe he had attempted to fill Miller's position prior to 1973, the Army presented no documentary evidence or testimony indicating the nature of the cancelled position.

[2]. It is also stipulated in the pre-trial order that during 1973 at the Dugway Proving Ground in Utah, the Army downgraded and filled six supervisory positions with promotion potential. It filled without downgrading an additional 15 supervisory positions. All 21 positions were filled with non-minorities. No records are available regarding the name, minority or non-minority classification, rating and/or ranking of the rejected applicants. In addition, no records are available to indicate why some of the positions were downgraded and others were not, although the Army presented evidence of a general policy to lower the overall grade level at Dugway. Approximately a year after Dyer was promoted to the position at issue, he was promoted to a GS–13. The position was subsequently upgraded as well.

0800 job classification series, which is the Civil Service classification for engineering. Mohammed, on the other hand, had been a Supervisory General Engineer for approximately four years, the identical job title in the 0801 job series at the same grade level (GS–12) as the position in question.

Mohammed filed an administrative complaint of discrimination. Harmon's failure to convene an ad hoc committee in connection with the selection process was subsequently determined by the Army to constitute a procedural defect. The Army ordered that the candidates be ranked retroactively using the ad hoc procedure. A three-member committee met in January 1975 and was given a Ranking Guide for use in evaluating the candidates' qualifications. The committee was admonished not to consider any experience acquired by Dyer in the position subsequent to his appointment in late summer of 1973. The committee ranked Mohammed first with a point total of 22⅓ and Dyer second with a total of 22. As a consequence, both candidates were considered "Best Qualified," and Dyer retained the position.

## I.

### Prima Facie Case

Mohammed argues that the district court's articulation of the elements of a prima facie case of promotion discrimination was legally incorrect. The court set out the elements of a prima facie case as "(1) qualified applicant; (2) racial minority; (3) unsuccessful application for existing vacancy; and (4) employer continuing to seek further applicants." Rec., vol. I, at 241. After noting that Mohammed had satisfied the first three elements, the court concluded that Mohammed had failed to establish the fourth element because the position did not remain open, but was filled by another.

Under the three stage analysis of a Title VII claim, the plaintiff initially must establish a prima facie case of employment discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Although the four elements of a prima facie case applied by the district court in this case are identical to those set out in *McDonnell Douglas,* the Supreme Court specifically noted there that the prima facie case is a flexible standard that may differ according to differing fact situations. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13; *see also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 1094 n. 6, 67 L.Ed.2d 207 (1981); *Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). The claim in *McDonnell Douglas* involved an alleged discriminatory refusal to rehire, while this case involves an alleged discriminatory refusal to promote.

The function of the prima facie case is to eliminate "the most common nondiscriminatory reasons for the plaintiff's rejection." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. The plaintiff need only establish that he was qualified for an available position "but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.* at 253, 101 S.Ct. at 1094. Viewed in this light, the district court's requirement that a plaintiff must prove the position remained unfilled would preclude a plaintiff from establishing a prima facie case of promotion discrimination if the position were simultaneously filled by a non-minority, a circumstance giving rise to an inference of discrimination. Such a result is plainly at odds with the purpose of the prima facie case. *See Simon v. Honeywell, Inc.,* 642 F.2d 754, 755 n. 4 (5th Cir.1981).

In similar circumstances we recently held that a plaintiff establishes a prima facie case of discriminatory failure to promote "by fulfilling *McDonnell Douglas's* first three criteria and showing that the position was filled by another." *Mortenson v. Callaway,* 672 F.2d 822, 823 (10th Cir.1982). *See also Bauer v. Bailar,* 647 F.2d 1037, 1044–45 (10th Cir.1981); *Nulf v. International Paper Co.,* 656 F.2d 553, 558 (10th Cir.1981). We conclude that Mohammed established a prima facie case as a matter of law based on the undisputed facts in this case.

## II.

### *The Findings of Fact*

■ In a Title VII suit, after the plaintiff has established a prima facie case, the employer must come forward with a legitimate, nondiscriminatory reason for the decision made. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant." *Id.* at 255, 101 S.Ct. at 1094 (footnote omitted).

■ If the employer meets this burden of production, the plaintiff must be given the opportunity to show that the stated reason was only a pretext for prohibited discrimination. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. "This burden now merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Evidence relevant to such a showing includes: (1) the employer's prior treatment of the plaintiff, *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; (2) the employer's "general policy and practice with respect to minority employment," particularly statistics reflecting a general pattern and practice of discrimination, *id.* at 804–05, 93 S.Ct. at 1822–26; (3) disturbing procedural irregularities, *see Williams v. Boorstin,* 663 F.2d 109, 117 (D.C.Cir.1980); *Williams v. DeKalb County,* 577 F.2d 248, 255 (5th Cir.), *modified on other grounds,* 582 F.2d 2 (5th Cir.1978); and (4) the use of subjective criteria, *Bauer,* 647 F.2d at 1045–46; *Thornton v. Coffey,* 618 F.2d 686, 691 (10th Cir.1980), especially when used to evaluate candidates that are not objectively equally qualified, *Adams v. Gaudet,* 515 F.Supp. 1086, 1097 (W.D.La.1981).

In this case, the district court stated that even if the burden of production shifted to the employer, the legitimate business reasons given supported the selection made. The court concluded:

"The evidence in this case indicates that the selecting officer, when presented with two qualified applicants, appropriately considered the experience and familiarity of the candidates with the position to be filled. He did not make the selection on the basis of plaintiff's race but rather on what he considered to be Mr. Dyer's strong attributes."

Rec., vol. I, at 240. In support of this determination, the court found that Dyer had six years of experience in the munitions branch under Miller and that both candidates were "amply" qualified. *Id.* at 241. The court then rejected all the evidence presented by Mohammed tending to prove pretext and intentional discrimination, finding that the selecting official was "conscientious, analytical and objective." *Id.*

After reviewing the entire record, we conclude that the trial court's determinations on these issues must be reversed. In so doing, we are mindful that the trial court's findings of fact are not to be set aside unless clearly erroneous. Fed.R.Civ.P. 52. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We have such a definite and firm conviction in this case because the district court's determinations do not accurately reflect the totality of the evidence, much of which is undisputed.

The required qualifications and experience set out in the job opportunity announcement included a bachelor's or higher degree in engineering, three years of professional experience in engineering, and supervisory experience.[3] Dyer testified that

---

**3.** The job announcement that was posted specified the following:

"QUALIFICATIONS: Three years of professional experience.

"BASIC REQUIREMENTS: Candidates must show successful completion of a full 4-year professional engineering curriculum leading to a bachelor's or higher degree in engineer-

he did not have an engineering degree. When asked at trial why he applied for the position when he lacked an engineering degree, Dyer replied, "It was an opportunity to see if I could get ahead." Rec., vol. IV, at 150. The Army produced evidence that Dyer could be considered qualified by reference to alternative criteria set out in the Army Personnel Manual (X–118). However, the Army's own expert testified that even though a candidate could be qualified by alternative criteria, specific qualifications were placed in the announcement because "the purpose of these announcements are [sic] to secure the best qualified people to fill jobs." *Id.* at 374. The only reasonable inference to be drawn from this evidence is that a candidate who meets the specific requirements in the job announcement is better qualified than one who must resort to alternative criteria. It has never been contended that Mohammed did not fully satisfy the specific requirements.

Harmon testified that he considered a degree in physics, which Dyer had, preferable to an engineering degree. As we have pointed out, however, the job announcement specifically required an engineering degree. Moreover, even if the candidates'

background in physics were a permissible consideration, comparison of the course titles in the college transcripts of Mohammed and Dyer shows that Mohammed had taken more courses directly related to a physics curriculum than had Dyer. When the career records of Mohammed and Dyer are compared in terms of grade level, supervisory experience, length of service, and education, the undisputed facts establish that Mohammed's record is objectively superior.

The only area in which Dyer was arguably as qualified as Mohammed was munitions experience. The trial court pointed out that Dyer had six years of experience in the Munitions Branch, a factor that Harmon accorded great weight. However, Mohammed had prior experience in munitions at the Tooele Army Depot, at the Ammunition Equipment Office in Seal Beach, California, and at the Naval Plant in Azusa, California. The trial court was obviously impressed that the ad hoc committee ranked Mohammed over Dyer by only one-third of a point. Thus, the court concluded that this fact "demonstrates that both candidates were amply qualified for the position and that the selection of either individual by Mr. Harmon was justified." Rec.,

ing in an accredited college or university. To be acceptable, the curriculum must: (1) Be in a school of engineering with at least one curriculum accredited by the Engineers' Council for Professional Development (ECPD) as a professional engineering curriculum, or (2) Include differential and integral calculus and courses (more advanced than first year physics and chemistry) in five of the following seven areas of engineering science or physics: (a) statics, dynamics; (b) strength of materials (stress-strain relationships); (c) fluid mechanics, hydraulics; (d) thermodynamics; (e) electrical fields and circuits; (f) nature and properties of materials (relating particle and aggregate structure to properties); (g) any other comparable area of fundamental engineering science or physics, such as optics, heat transfer, soil mechanics, or electronics. "EXPERIENCE: Three years of professional experience in Engineering. At least one year of the required experience must have been at a level of difficulty comparable to GS–11. "SUPERVISORY EXPERIENCE: Candidates must possess, or have the potential to develop, the following: (a) Ability to deal effectively with individuals or groups representing widely divergent backgrounds, interests and points of view. (b) Ability to adjust work operations to meet emergency or changing program or production requirements within available resources and with minimum sacrifice of quantity or quality of work. (c) Ability to establish program objectives or performance goals and to assess progress toward their achievement. (d) Ability to coordinate and integrate the work activities of several organizational segments or several different projects. (e) Ability to analyze organizational and operational problems and develop timely and economical solutions. (f) Ability to represent the activity both within and outside the organization or agency and to gain support for the agency's program goals. "METHOD OF RATING CANDIDATES: Candidates will be rated by the Civilian Personnel Office in the order of qualified or not qualified. "METHOD OR [sic] RANKING CANDIDATES: Candidates will be ranked by an ad hoc committee as to best qualified. "REFERENCE: X–118 dtd Apr 69." Rec., Vol. III, Pl.Ex. 4.

vol. I, at 241. However, the guide the ad hoc committee was required to follow in its ranking process did not reflect the requirements established in the job announcement.[4] The guide was heavily weighted in favor of direct recent experience, Dyer's only strong point. One member of the committee questioned the formulation of the guide, and testified he would have awarded additional points to Mohammed had the guide permitted. The Army personnel responsible for producing the Ranking Guide were never identified at trial, and the guide indicates on its face that it originated from the Munitions Branch.

In sum, the record as a whole does not support the district court's finding that both candidates were *amply* qualified. More importantly, when an employer rejects a minority candidate in choosing between competing individuals, the critical determination is whether they are *equally* qualified. *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096. This record does not permit a finding that Dyer's qualifications were equal to those of Mohammed.

Evidence that an employer has misjudged the qualifications of candidates is "probative of whether the employer's reasons are pretexts for discrimination." *Id.* Moreover, the use of subjective factors supports an inference of pretext when an employer justifies rejection of a minority candidate on the basis of such factors even though the minority is objectively better qualified than the non-minority chosen. *Adams,* 515 F.Supp. at 1097. The use of such subjective criteria as "dedication" and "enthusiasm" also "may offer a convenient pretext for giving force and effect to racial prejudice," *Thornton,* 618 F.2d at 691, and "can create a strong inference of discrimination if there is a showing of significant disparity in the representation of a particular group." *Bauer,* 647 F.2d at 1045; *see*

*also Abrams v. Johnson,* 534 F.2d 1226, 1231 (6th Cir.1976); *Adams,* 515 F.Supp. at 1097. It is undisputed that no minority group member, Hispanic or otherwise, has ever held a supervisory position in the Test Operations Directorate at Dugway.

An employer "has discretion to choose among *equally qualified* candidates, provided the decision is not based upon unlawful criteria." *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1097 (emphasis added). Here the candidates were not equally qualified, and Mohammed offered undisputed evidence supporting an inference of pretext, including reliance in part upon subjective evaluations, serious procedural irregularities, cancellation of the first job announcement after he had applied, statistical evidence of the complete lack of minority supervisors, and affirmative action programs adopted but not implemented. Based on our review of the whole record, we are definitely and firmly convinced the only reasonable inference to be drawn is that the employment decision was motivated by intentional, improper discrimination. The lower court's determination that no discrimination occurred is therefore clearly erroneous.

Accordingly, the judgment below is reversed and remanded with directions to enter judgment for plaintiff. *See, e.g., Meyer v. Missouri State Highway Commission,* 567 F.2d 804, 809–11 (8th Cir.1977), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1888, 56 L.Ed.2d 395 (1978). The district court should formulate appropriate relief.

---

4. For example, the guide permitted two points to be given for a bachelor's degree in any field, while the job announcement required a professional engineering degree. Each committee member thus gave Dyer and Mohammed two points for education, even though Mohammed had a bachelor's degree in engineering and had

completed over half the requirements toward a master's degree in engineering. In addition, the guide made no provision for awarding points for supervisory experience, although the job announcement devoted a full paragraph to detailing the particulars of the required supervisory experience. *See supra* note 3.