FILED
United States Court of Appeals
Tenth Circuit

November 5, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

GEORGE M. ROBERTS,

      Plaintiff - Appellant,

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

      Defendant - Appellee.

No. 12-5169

---

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:11-CV-00040-JHP-PJC)**

---

Daniel E. Smolen (Donald E. Smolen, II with him on the briefs), of Smolen, Smolen & Roytman, PLLC, Tulsa, Oklahoma, for Plaintiff-Appellant.

Timothy A. Carney (Erin K. Dailey with him on the brief), of GableGotwals, Tulsa, Oklahoma, for Defendant-Appellee.

---

Before **GORSUCH**, **BALDOCK**, and **BACHARACH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

    George Roberts says IBM fired him because of his age. He insists an instant messaging conversation between two of the company's human resources managers proves as much. The topic of that conversation was Mr. Roberts's

possible inclusion in a "Resource Action." Less euphemistically, the pair were discussing whether to eliminate Mr. Roberts's position on the ground that he didn't have enough billable work to justify the expense of paying him. By the conversation's end, the two HR managers agreed to remove Mr. Roberts from the Resource Action — that is, they chose to retain him at that point in time. But they also agreed to reevaluate Mr. Roberts's place in the company a few months later if his performance continued to decline. On the way to these conclusions, one of the HR managers asked about Mr. Roberts's "shelf life." And it is this question, Mr. Roberts contends, that shows age played a direct role in his eventual discharge. After all, shelf life depends on an item's freshness, at least in the supermarket.

Any fair reading of the conversation, though, reveals that the "shelf life" here had nothing to do with Mr. Roberts's age and everything to do with his workload. Just as the district court held when granting IBM's motion for summary judgment. Immediately before the mention of Mr. Roberts's "shelf life," and again immediately afterward, the HR managers' attention was focused on the quantity of billable work Mr. Roberts faced. At the time, he was assigned to provide technical assistance to an IBM client, the Williams Companies, and IBM's HR managers were trying to ascertain how much work remained on that assignment. All this was entirely understandable because the whole point of an IBM "Resource Action" is to eliminate positions that aren't any longer cost-

justified.  If Mr. Roberts was going to continue having ample billable work for the foreseeable future, they didn't want to eliminate his position; if he was about to "hit the bench," as the HR managers put it, they did.  After determining that Mr. Roberts had enough paying client work to keep him occupied for the time being, they removed his name from the list of employees to be discharged through the Resource Action.

The bottom line, then, is this.  Once its euphemisms and acronyms are translated into English, the instant message conversation unmistakably suggests that "shelf life" was nothing worse than an inartful reference to Mr. Roberts's queue of billable work.  And that is more than enough to preclude it from amounting to direct evidence of discrimination in violation of the federal Age Discrimination in Employment Act, as Mr. Roberts supposes.  As our precedents clearly hold, evidence requiring any inference to suggest age discrimination, let alone an inference so large as Mr. Roberts asks us to make about the "shelf life" comment, qualifies at most as circumstantial, not direct, evidence of an ADEA violation.  *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) ("[I]f the content and context of a statement allow it to be plausibly interpreted in two different ways — one discriminatory and the other benign — the statement does not qualify as direct evidence."); *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007).

Neither can we accept Mr. Roberts's alternative suggestion that the name of IBM's Resource Action, "Project Blue," constitutes direct evidence of age discrimination. Mr. Roberts's guiding thought here seems to be that the name was an allusion to blue rinses sometimes used by older people or to the resulting hair styles they sport. Standing alone, though, the HR department's bare mention of the color blue (accompanied by not a hint of hair) cannot reasonably be taken as a reference to anyone's age. Perhaps especially in a company itself widely known to have embraced the color and often called "Big Blue." Neither does the mention of the color amount to direct evidence that anyone was discriminated against on account of age — much less direct evidence *Mr. Roberts* was discriminated against on account of *his* age. After all, he wasn't even discharged as part of the "Project Blue Resource Action," but fired through a different process months later. So here again it takes a large leap to get from Mr. Roberts's evidence to the conclusion that IBM fired him because of his age. And here again that leap necessarily means it isn't direct evidence of discrimination.

Without direct evidence of discrimination, the question becomes whether Mr. Roberts has amassed sufficient circumstantial evidence to suggest IBM fired him on account of his age. When a plaintiff seeks to prove age discrimination under the ADEA using circumstantial rather than direct evidence, we evaluate the claim using the *McDonnell Douglas* burden-shifting approach: If a terminated employee can make a prima facie case of discrimination, the burden shifts to the

employer to articulate a nondiscriminatory reason for firing the employee. If the employer can do that, the employee picks up the burden once more and can survive summary judgment by identifying evidence that could support a reasonable jury's concluding that the employer's proffered rationale is a mere pretext for discrimination. *Tabor*, 703 F.3d at 1216-17 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Even assuming (without granting) the circumstantial evidence Mr. Roberts has amassed is enough to establish a prima facie case of discrimination, pretext proves still a problem. To establish pretext under the ADEA, an employee must show there is enough inconsistency or implausibility in his employer's stated explanation for the firing that a reasonable trier of fact could find it unworthy of belief. *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007). Mr. Roberts seems to think IBM's stated reason for firing him — poor performance — is implausible because the company didn't consistently express negative views of his job performance: even though it criticized his work on occasion, at other times it told him he was improving. But changes in an employer's estimation of its employee's job performance, without more, cannot establish pretext as a matter of law. After all, the quality of the employee's job performance is itself capable of change and an employer isn't prohibited from acting on honestly held beliefs about those changes. Put simply, "prior good evaluations alone cannot establish that later unsatisfactory evaluations are

pretextual. To hold otherwise would be to hold that things never change, a proposition clearly without basis in reality." *Billet v. CIGNA Corp.*, 940 F.2d 812, 826 (3d Cir. 1991) (citations omitted), *overruled in part on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

To suggest pretext, Mr. Roberts would have to advance evidence that IBM's changed evaluation of his performance, whether wise or mistaken, wasn't honestly arrived at. *See Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006). That he hasn't done, and cannot do with this record. The evidence shows that Mr. Roberts's supervisor began hearing complaints from Williams as soon as she assumed that role in June 2008. Williams's employees repeated their concerns about Mr. Roberts's work four months later, in October. At the end of 2008, his work was criticized again in a performance review. In March 2009, on the other hand, he was told he had made some improvement. But his mid-2009 performance review was critical once more, indicating that IBM was again dissatisfied. It was in July that IBM offered Mr. Roberts the option of either resigning with severance compensation or undergoing a 60-day program for the sake of improving his performance — but with the caveat that a failure to demonstrate sustained improvement would be grounds for termination. Mr. Roberts chose the latter and succeeded in convincing his employer that his work had improved at the program's conclusion in November. Shortly, though, both client and supervisor concerns resumed, and a negative performance review

followed at the end of 2009 and his termination came the month after that. This evidence surely implies that Mr. Roberts's performance had its ups as well as its downs. But, that much again, without more, does nothing to cast doubt on whether IBM officials honestly believed in January 2010 that Mr. Roberts's performance was poor. Missing from the record is any (essential) hint that Mr. Roberts's superiors didn't actually hold the views they expressed about his performance.

Mr. Roberts replies that we can find pretext by comparing IBM's treatment of him with its treatment of other employees whose work prompted complaints. As we have explained, evidence that a similarly situated employee received better treatment can suggest that the employer's alleged nondiscriminatory reason is merely pretextual. *Riggs*, 497 F.3d at 1120. But to provide a basis for reliable comparison, the other employee must, in fact, be similarly situated — that is, reporting to the same supervisor, held to the same standards, and afoul of those standards to at least the same degree. And it falls on the employee alleging discrimination to rule out alternative explanations for the differential treatment. *Timmerman*, 483 F.3d at 1120-21.

This is another standard Mr. Roberts fails to meet. He points to a handful of employees who like him received some complaints from IBM's customers but weren't disciplined for it. But some of these other employees weren't supervised by Mr. Roberts's HR manager. And none of them, so far as we can tell, had

histories of performance issues as extensive as Mr. Roberts's. Because he hasn't ruled out the possibility that the differences in treatment are due to differences in performance, we can find no sign of pretext in the facts he highlights.

His federal ADEA claim aside, Mr. Roberts argues his termination independently violated Oklahoma state law in three ways.

First, he renews his argument that IBM fired him because of his age, citing Oklahoma's *Burk* tort, which prohibits such things. *See Burk v. K-Mart Corp.*, 770 P.2d 24 (Okla. 1989); *Kruchowski v. Weyerhaeuser Co.*, 202 P.3d 144, 154 (Okla. 2008). To establish a *Burk* claim, however, the plaintiff must show that age was at least a significant motivating factor. *Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1197 (10th Cir. 2010). Though this state law causation standard might be formulated a little differently than the ADEA's "but-for" causation standard, *see id.*, we have no reason to explore whether and to what extent those differences in formulations make any difference in practice or whether one might preempt the other. We don't because, for reasons we've already outlined, there are simply no facts in this record to support the conclusion that age was either a significantly motivating or a but-for factor behind Mr. Roberts's discharge.

Mr. Roberts's second *Burk* claim fares no better. He says that his termination violated Oklahoma public policy because it came about as retaliation for his decision to voice concerns about his supervisors' attitude toward his age.

- 8 -

The parties disagree on the viability of such a claim under the *Burk* framework given the alternative federal remedies already available for retaliation under the ADEA. But even assuming for argument's sake a retaliation claim under *Burk* isn't in some way preempted by federal law, we see no evidence in the record that could persuade a rational trier of fact that Mr. Roberts should prevail. Mr. Roberts says he was fired five months after he told his HR manager and the EEOC he believed his performance had been unfairly criticized because of his age. That alone isn't enough to suggest IBM's discharge was the product of retaliatory animus rather than his performance problems. Indeed, we doubt the mere sequence of events would suffice under Oklahoma (or, for that matter, federal) law even if IBM had acted much more quickly after Mr. Roberts expressed his concerns. *See generally Thompson v. Medley Material Handling, Inc.*, 732 P.2d 461, 464 (Okla. 1987) (determining that employee's termination six weeks after filing for workers' compensation was insufficient grounds for sending retaliatory discharge claim to a jury); *Taylor v. Cache Creek Nursing Ctrs.*, 891 P.2d 607, 610 (Okla. Ct. App. 1994) ("The facts show plaintiff was fired immediately after returning from a two-week, doctor-ordered disability leave. However, this in itself does not raise a legal inference that the firing was significantly motivated by retaliation."); *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) (adverse action occurring three months after protected activity is not enough to show causation).

Finally, Mr. Roberts characterizes his termination as intentional infliction of emotional distress.  In Oklahoma, that tort requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1378 (Okla. 1978). Nothing in this record suggests IBM's conduct came anywhere close to that.

The district court's grant of summary judgment is affirmed.