**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ANNA M. HAMILTON,

      Plaintiff - Appellant,

v.

OKLAHOMA CITY UNIVERSITY,

      Defendant - Appellee.

No. 12-6323
(D.C. No. 5:10-CV-01254-D)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **HOLLOWAY**,[**] and **GORSUCH**, Circuit Judges.

      Dr. Anna Hamilton was teaching part-time at Oklahoma City University ("OCU")

---

      [*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

      [**] The late Honorable William J. Holloway, Jr., United States Senior Circuit Judge, participated as a panel member when this case was heard, but passed away before final disposition. "The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal." United States v. Wiles, 106 F.3d 1516, 1516 n.* (10th Cir. 1997); see also 28 U.S.C. § 46(d) (noting circuit court may adopt procedure permitting disposition of an appeal where remaining quorum of panel agrees on the disposition). The remaining panel members have acted as a quorum with respect to this Order and Judgment.

when a full-time, tenure-track faculty position became available in its philosophy department. She applied, gave several interviews, and made the shortlist of finalists. OCU ultimately hired someone else—a man Hamilton says was unqualified for the job. She sued OCU, alleging the university had discriminated against her on the basis of sex in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. ("Title VII").

OCU defended its hiring decision before the district court, arguing that Jacob Stutzman, the man it hired, was thoroughly qualified and a better fit for the position. Hamilton, in turn, asserted that OCU's explanation for hiring Stutzman was merely pretextual. OCU sought summary judgment, which the district court granted. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I

Because this is an appeal from a grant of summary judgment, "[w]e recite the facts in this case as we must view them: in the light most favorable to the party opposing summary judgment." Tabor v. Hilti, Inc., 703 F.3d 1206, 1211 n.1 (10th Cir. 2013).

When Hamilton joined OCU as a part-time adjunct professor in 2006, the school's debate team had been experiencing a slump for some time. Hamilton took charge from 2006 to 2008, coaching the collegiate debaters on a part-time basis. During that period, she and the team experienced what she describes as "some successes." In late 2008, OCU began forming plans to restore its debate program to prominence by cultivating a highly competitive debate team. This entailed the creation of a faculty position within its philosophy department for an assistant professor of rhetoric and director of forensics. It

was to be a full-time, tenure-track professorship dedicated to fostering excellence in debate. In its job posting announcing this new position, OCU emphasized that it was "especially interested in candidates who [had] extensive debate and forensics experience." In addition, the job announcement noted the requirement of a "Ph.D. prior to tenure-track appointment," and that prospective applicants "should hold a PhD [sic] in a related discipline at the time of appointment."

OCU formed a search-and-selection committee consisting of five OCU faculty members: Dr. Scott Davidson, Dr. Robin Meyers, Dr. Lisa Wolfe, Dr. Mark Griffin, and Pierre Cyr, as well as one nonvoting member who was a student on the debate team. Under OCU's internal hiring policies, memorialized in a document entitled "Process and Policies for Filling Full-Time Faculty Positions," the committee was tasked with "establish[ing] the criteria by which each applicant [would] be evaluated." The policy required that "[t]hese criteria must be in agreement with the ad and job description."

Following an initial round of telephone interviews with all applicants, the committee narrowed its search to three finalists: Hamilton, Stutzman, and Monica Flippin-Wynn. Hamilton was the only finalist who worked at OCU at the time. She was also the only applicant who already possessed a doctoral degree—namely, a Ph.D. in communications. It is undisputed that both Stutzman and Flippin-Wynn were what are commonly termed "all but dissertation" ("ABD") candidates, meaning they had completed all of the requirements for receiving their doctoral degrees except their dissertations. According to Meyers, a candidate's lack of a doctoral degree was

"somewhat of a minus" but not much of one, in that "ABD candidates are hired all the time, if the determination is made that they are far enough along in the program that they can be expected to finish reasonably soon."

At the time he applied for the job at OCU, Stutzman was a doctoral student at the University of Kansas, where he was teaching courses in public speaking and rhetoric. Stutzman had an accomplished debate pedigree. In 2000, while a student at Truman State University in Missouri, Stutzman won a national collegiate debate championship. He also worked as the assistant debate coach at Truman State after graduation, before earning his Master of Arts degree from Texas State University. While at Texas State, he taught courses in communications and served as assistant director of forensics. When he applied for the position at OCU, Stutzman had a combined four years of full-time teaching experience at the collegiate level, plus a combined eight years of experience competing in and coaching college-level debate.

Hamilton applied for the position at OCU with sixteen years of teaching experience in higher education and two-and-a-half years of debate-coaching experience, garnered during her part-time stint at OCU. She received her Ph.D. in communications from the University of Oklahoma in 2002. Flippin-Wynn had four years of experience as a debate and forensics director at the college level, as well as eleven years of college-level teaching experience. When she applied for the OCU position, Flippin-Wynn was a Ph.D. candidate in communications at the University of Oklahoma.

The committee conducted in-person interviews with the three finalists. They were

-4-

joined by three members of OCU's administration, including Dr. Terry Conley, Interim Dean of the Petree College of Arts and Sciences. In addition to their interviews, each finalist was required to give a teaching demonstration to OCU faculty and students.[1] They also participated in a luncheon with the committee members and OCU students.

Afterward, the committee members met to make their final hiring recommendation. Each member anonymously ranked the three finalists in order of preference. Four of the five faculty members—Davidson, Meyers, Wolfe, and Cyr— ranked Stutzman as their first choice, Hamilton as their second choice, and Flippin-Wynn as their third choice. Griffin initially ranked Flippin-Wynn first, with Hamilton second and Stutzman third, but he eventually agreed that Stutzman should be recommended for the position. All five committee members ranked Hamilton as their second choice. Stutzman decisively emerged as the frontrunner.

In deposition testimony, the committee members said they settled on Stutzman because of his extensive experience as a collegiate debater and debate coach, his impressive performance during the interview and teaching demonstration, and his evident rapport with OCU students. To be sure, the committee members were aware that Stutzman had not yet obtained his doctoral degree. But, after making due inquiry of his

---

[1] Dr. Leo Werneke, the retired Dean of the College of Arts and Sciences and former Chair of the Department of Philosophy, also observed these teaching demonstrations and asked the candidates questions. Werneke testified at deposition that after the demonstrations he told Davidson that either Stutzman or Hamilton "would be pretty good" for the job, but that he thought Stutzman "did a somewhat better presentation."

dissertation advisor at the University of Kansas, they were assured he was on the cusp of completing the final requirements. And the committee did not see this as a stumbling block, given that "ABD candidates are hired all the time, if the determination is made that they are far enough along in the program that they can be expected to finish reasonably soon." With the committee satisfied that this was the case, in April 2009 OCU formally offered Stutzman the job. He accepted and began teaching at OCU that August.

In November 2010, Hamilton filed a complaint against OCU in federal district court, asserting claims that fell into three categories: (1) gender discrimination, in violation of Title VII; (2) disability discrimination,[2] in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and Oklahoma law; and (3) a state-law tort claim for wrongful employment actions made in contravention of Oklahoma public policy. OCU moved for summary judgment on all claims. Hamilton then voluntarily dismissed her state-law tort claim.

The district court granted summary judgment to OCU, dismissing Hamilton's claims. Hamilton brought this timely appeal. Because she has voluntarily abandoned her claim of disability discrimination, we review only the district court's grant of summary judgment on Hamilton's Title VII gender-discrimination claim.

_____

[2] Hamilton alleged in her complaint that she suffers from a form of vertigo and uses a service dog to assist her with walking and keeping her balance. She claimed that the committee discriminated against her, in part, on account of her disability and attendant reliance on the service dog. The disability-discrimination claim is not before us on appeal, and we express no opinion on its merits.

## II

We review de novo a grant of summary judgment, applying the same legal standard used by the district court. See Turner v. Pub. Serv. Co., 563 F.3d 1136, 1142 (10th Cir. 2009). We view the facts in the light most favorable to Hamilton as the nonmoving party and "draw all reasonable inferences" in her favor. Tabor, 703 F.3d at 1215 (quotation omitted). "[A]though the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).

Summary judgment is appropriate only if OCU shows "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Tabor, 703 F.3d at 1215 (quotation omitted); see also Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000) (citation omitted).

"Title VII of the Civil Rights Act of 1964 prohibits, among other things, unlawful employment discrimination on the basis of an individual's sex." Id.; see 42 U.S.C. § 2000e-2. Hamilton has not pointed to direct evidence of gender discrimination by OCU. "Where, as here, a Title VII plaintiff relies on indirect or circumstantial evidence to show discrimination, we examine the claim under the familiar burden-shifting framework" first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Young v. Dillon Cos., Inc., 468 F.3d 1243, 1249 (10th Cir. 2006).

Under the McDonnell Douglas burden-shifting approach, "a plaintiff carries the

initial burden of establishing a prima facie case of discrimination." Tabor, 703 F.3d at

1216. At this stage, the burden is "slight." Orr v. City of Albuquerque, 417 F.3d 1144,

1149 (10th Cir. 2005). To state a prima facie case of discrimination, a plaintiff must

establish by a preponderance of the evidence "that (1) she belongs to a protected class;

(2) she applied for an available position for which she was qualified; [and] (3) she 'was

rejected under circumstances which give rise to an inference of unlawful

discrimination.'" Tabor, 703 F.3d at 1216 (quoting Texas Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 248, 253 (1981)).[3] If a plaintiff succeeds in establishing a prima facie

_____

[3] The district court, in assessing Hamilton's prima facie case, applied an older, four-part test derived from the original McDonnell Douglas model. "We use a more recent variation of this test, a three-part test articulated by the Supreme Court in Burdine, which the Tenth Circuit expressly prefers." Tabor, 703 F.3d at 1216 n.4 (citing Sorbo v. United Parcel Serv., 432 F.3d 1169, 1173 (10th Cir. 2005)). Following Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1469 (10th Cir. 1992), the district court recited that Hamilton "must show: 1) she is a female; 2) she was qualified for the position; 3) she was not selected; and 4) the position was offered to a male." It was not strictly necessary, however, for Hamilton to make the fourth-prong showing that the position ultimately went to someone outside of her protected class—here, a man. See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000) ("Significantly, the Supreme Court did not indicate in McDonnell Douglas that a plaintiff is required to show that the defendant hired someone outside of the protected class in order to make out a prima facie case.").

Under Burdine's three-part test, the relevant (and necessarily broader) focus is on whether the plaintiff has made "a showing of circumstances giving rise to an inference of discrimination." Sorbo, 432 F.3d at 1173 (quotation omitted); see also Kendrick, 220 F.3d at 1227 ("The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which

Continued . . .

case, "the burden shifts to the employer to proffer a legitimate non-discriminatory purpose for the adverse employment action." Tabor, 703 F.3d at 1216-17 (quotation omitted). Here, the employer's "burden is one of production, not persuasion." Reeves, 530 U.S. at 142.

The parties agree that McDonnell Douglas' first two steps are satisfied. "The real dispute in this case, like many others, centers on McDonnell Douglas' third step": pretext. Johnson v. Weld Cnty., 594 F.3d 1202, 1211 (10th Cir. 2010). "To satisfy this step and overcome summary judgment, [Hamilton] must show that [OCU]'s asserted reason 'was not the true reason for the employment decision.'" Tabor, 703 F.3d at 1218 (quoting Burdine, 450 U.S. at 256). Hamilton may demonstrate pretext by pointing out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Lobato v. N.M. Env't Dep't, 733 F.3d 1283, 1289 (10th Cir. 2013) (quotation omitted). Guided by this analytical

---

give rise to an inference of unlawful discrimination." (quotation omitted)). Although "this broader requirement may be (and often is) satisfied by" proof that the employer hired or promoted someone outside of the protected class, "such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case." Sorbo, 432 F.3d at 1173. Regardless of which formulation is used, Hamilton's burden at the prima facie stage "is not onerous, which is evidenced by the small amount of proof necessary to create an inference of discrimination." Orr, 417 F.3d at 1149 (quotations and alteration omitted). And, in any event, OCU does not dispute that Hamilton has satisfied her prima facie burden in this case.

framework, we turn to Hamilton's evidence on the issue of pretext.

Hamilton asserts she has provided evidence sufficient to raise a genuine issue of material fact as to whether OCU's stated reason for declining to hire her is pretextual. In the main, she argues that Stutzman was objectively unqualified for the job because he—unlike her—did not have a Ph.D. at the time he was hired. Hamilton further contends that OCU's hiring committee was, in effect, intrinsically geared toward discriminatory decisionmaking because it had only one female member. Finally, Hamilton makes the broad argument that, as a general matter, OCU shows "favoritism towards males" because no woman has ever become a tenured professor in its philosophy department.

According to Hamilton, all of this evidence leads to the conclusion that she was denied the job due to her gender. Even viewing the evidence in the light most favorable to Hamilton, we cannot agree. Hamilton has failed to establish the existence of a genuine and material dispute about whether OCU discriminated against her on the basis of sex.

At the core of Hamilton's argument is her insistence that Stutzman did not meet the minimum qualifications for the position because he did not have a Ph.D. when OCU offered him the job. She says OCU ignored its own job requirements and written hiring policies in its rush to hire an unqualified male candidate and that this, in itself, is sufficient to raise an inference of pretext.

At the outset, we acknowledge the prudent admonition that courts "must proceed with caution when considering the relative merits of individual employees" or candidates for employment. Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005)

-10-

(per curiam). To that end, "[w]e will draw an inference of pretext where the facts assure us that the plaintiff is better qualified than the other candidates for the position." Santana v. City & Cnty. of Denver, 488 F.3d 860, 865 (10th Cir. 2007) (quotation omitted). But "minor differences between a plaintiff's qualifications and those of a successful applicant are not sufficient to show pretext." Jaramillo, 427 F.3d at 1308-09. "[T]o suggest that an employer's claim that it hired someone else because of superior qualifications is pretext for discrimination rather than an honestly (even if mistakenly) held belief, a plaintiff must come forward with facts showing an 'overwhelming' 'disparity in qualifications.'" Johnson, 594 F.3d at 1211 (quoting Jaramillo, 427 F.3d at 1309).

As OCU explains, it hired Stutzman because it wanted a talented debate coach who could create a debate dynasty at the school. OCU's announcement for the new position stated that the successful applicant would have "primary responsibility for directing the debate and forensics team." Conley confirmed in his deposition testimony that "the primary reason we were filling the position" was "to hire someone to direct and to coach our debate team," and Wolfe testified that the committee agreed their main objective was to hire a debate coach. The job posting made it clear that OCU was "seek[ing] to rebuild a legacy" and emphasized that the school was "especially interested in candidates who [had] extensive debate and forensics experience."

At the time she applied for the position, Hamilton had been the debate team's part-time coach for the preceding two-and-a-half years, with what she characterizes as "some successes." She had held a Ph.D. since 1992. When he applied for the job, Stutzman had

-11-

accumulated eight years of experience both competing in and coaching debate at the college level, and he had won a national collegiate debate championship in 2000. He had completed all of the requirements of his Ph.D. program at the University of Kansas except for his dissertation.

Considering OCU's paramount interest in hiring a skilled, legacy-building debate coach, we are hard-pressed to conclude that "the disparity in qualifications" between Hamilton and Stutzman, such as it may be, is anywhere near "overwhelming." See Jaramillo, 427 F.3d at 1309 (quotation omitted). Hamilton effectively concedes as much, acknowledging in her opening brief that "her credentials were similar, if not better in some areas, than Stutzman's." Hamilton also admitted in her deposition testimony that she believed Stutzman was qualified for the position, although she thought he was less qualified than she was. Mindful of our responsibility to tread lightly when comparing the merits of competing job applicants, we nevertheless conclude from the record before us that Stutzman's qualifications are "certainly not overwhelmingly inferior" to Hamilton's, and any difference between them "does not come close to suggesting pretext." Johnson, 594 F.3d at 1212.

This conclusion alone does not quite settle the question of pretext, however, for Hamilton also argues that the plain language of OCU's job posting expressly required the successful applicant to have obtained his or her Ph.D. at the time of hiring—without exception. It is true that among the requirements listed in OCU's job posting is a "Ph.D. prior to tenure-track appointment." (Emphasis added.) In the same vein, the

-12-

announcement states that an "[a]pplicant should hold a PhD in a related discipline <u>at the time of appointment</u>."  (Emphasis added.)

OCU contends that Hamilton is misreading the language in the job announcement. According to OCU, the job posting's stated requirement of a "Ph.D. prior to tenure-track appointment" should be understood as prescribing a Ph.D. only as a condition for being awarded tenure at some later time, not for initial hiring.  In other words, any mention in the job posting of an "appointment" refers to the successful applicant's eventual elevation to a tenured professorship, with Ph.D. in hand, sometime after being hired for the job in question.  This would mean Stutzman, as an ABD candidate, was qualified for the position from the start and that nothing in the job posting could reasonably be construed as saying otherwise.

On this point, we do not find OCU's interpretation convincing.  The position of assistant professor of rhetoric and director of forensics was a tenure-track professorship, as plainly indicated in the job posting itself.  We think it entirely reasonable that an applicant for a <u>tenure-track</u> faculty position—looking only at the hiring requirements listed within the four corners of the announcement—would understand that the stated requirement of a "Ph.D. prior to tenure-track appointment" meant applicants for the position must earn that degree before being considered for the job.

If showing that OCU had not rigidly adhered to the stated requirements of its job posting were the only thing Hamilton needed to do in order to raise a fair inference of pretext and overcome summary judgment, we could resolve the issue in her favor without

-13-

further discussion. But that would prove far too pat a way of looking at employment decisions. This is because "a challenge of pretext requires us to look at the facts as they appear to the person making the decision." Kendrick, 220 F.3d at 1231. In other words, "we do not look to the plaintiff's subjective evaluation of the situation." EEOC v. C.R. England, Inc., 644 F.3d 1028, 1044 (10th Cir. 2011). "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." Lobato, 733 F.3d at 1289 (quotation and alteration omitted).

Stated concisely, both individuals and institutions can and will make mistakes in their hiring choices. But evidence of a mistaken or poorly informed employment decision is not, standing alone, suggestive of a discriminatory motive on the part of an employer. In order "[t]o support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did more than get it wrong." Johnson, 594 F.3d at 1211. Successful plaintiffs must advance "evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." Id. We follow this rule because, as judges, "our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." Young, 468 F.3d at 1250.

We agree with the district court that Hamilton has not presented any evidence that OCU's proffered explanation for choosing Stutzman, even if not strictly in accord with

-14-

the language in the job posting, actually masks a discriminatory motive. Indeed, the record is replete with evidence that OCU honestly believed it was following its own hiring guidelines and that, more specifically, it believed an ABD candidate like Stutzman was qualified for the position.

First, the committee members themselves did not think they were doing anything improper by considering an ABD candidate. At worst, a job applicant's ABD status was "somewhat of a minus" in the committee's eyes. It certainly was not seen as a deal-breaker. As Meyers testified, "ABD candidates are hired all the time, if the determination is made that they are far enough along in the program that they can be expected to finish reasonably soon." Davidson testified he did not remember the job posting unequivocally calling for a Ph.D.: "As I recall, it said PhD [sic] or ABD . . . ." In an email sent to the other committee members during the interviewing process, Davidson also wrote: "For Jacob [Stutzman] and Monica [Flippin-Wynn] who are both ABD, it is important for us to learn how far along they are on their dissertations and when they will defend." When asked whether Stutzman's lack of a Ph.D. was counted against him, Wolfe testified that the committee "certainly took that into account." She explained that "[w]e called his advisor, or someone on the committee did, and . . . asked some pretty pointed questions about how he was proceeding . . . . And how likely he was to finish very soon. And we all felt like we had gotten very good reassurance on that."

Committee member testimony is echoed in the statements of others in OCU's administration and faculty. Conley testified he could not recall whether the job posting

-15-

stated that a Ph.D. was required for initial hiring, noting only that "[w]e require the PhD [sic] for someone to become tenured." And Werneke, who has been employed by OCU since 1968 and was himself an ABD hire, suggested that an ABD applicant who is "clearly the best candidate" would get the nod despite the present lack of a completed doctoral degree. Even accepting the contention that OCU's posted job description indicated a Ph.D. was required in order to be hired, it is obvious that the OCU committee members and other officials believed there was nothing out of the ordinary—much less improper—about interviewing and hiring an ABD candidate who in all other respects was qualified for the position.[4] And Hamilton has presented no evidence that would "suggest those beliefs were held in bad faith." Young, 468 F.3d at 1251.

Hamilton also fails to convincingly explain why OCU's hiring committee selected Flippin-Wynn—who, like Stutzman, was ABD—as one of the three finalists for the position. The most Hamilton can muster is the bare allegation that the choice of Flippin-Wynn as a finalist was somehow designed to obscure OCU's true intention of hiring

---

[4] It has not escaped our attention that, at least as of the time this case was briefed and argued, Stutzman had yet to earn his doctorate. We do not, however, judge pretext with the luxury of hindsight. See Johnson, 594 F.3d at 1211-12 ("[W]e will examine the competing candidates' qualifications only in light of the facts available to the decisionmaker at the time of the decision, not in light of facts that might have been apparent to others or that might have become apparent only in hindsight."); see also McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment."). At the time the committee recommended Stutzman for the position, it had received "very good reassurance" that he was on the verge of completing his degree. There is no evidence that OCU had any reason to believe otherwise.

Stutzman. That is, OCU chose two women as finalists only to better camouflage the fact that it planned on giving the position to a man all along. Hamilton provides no factual support whatsoever for this assertion. Because "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings," Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 875 (10th Cir. 2004), we give no credence to Hamilton's conjecture about OCU's "true" reason for selecting Flippin-Wynn as a finalist.

In the end, Hamilton has failed to "come forward with facts showing an 'overwhelming' 'disparity in qualifications'" between her and Stutzman. Johnson, 594 F.3d at 1211 (quoting Jaramillo, 427 F.3d at 1309). Even assuming that OCU mistakenly believed an ABD candidate was fully qualified for the position, there is "no basis on which a reasonable fact finder could have found that [this belief] was not honestly held." Young, 468 F.3d at 1251. At most, Hamilton has shown that OCU neglected to follow its written hiring standards. This, without more, does not automatically give rise to an inference of pretext. "The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual." Randle v. City of Aurora, 69 F.3d 441, 454 (10th Cir. 1995) (emphasis in original); see also Johnson, 594 F.3d at 1213 ("[I]t remains the law that not every failure to follow every directive in an employer's policy manual gives rise to an inference of pretext for invidious discrimination.").

We have observed that "[e]mployers often fail to follow written policy manuals

for benign (sometimes even very sound) business reasons, and in any event our job isn't to enforce employment manuals but to protect against unlawful discrimination." Johnson, 594 F.3d at 1213. That is why, in order "[f]or an inference of pretext to arise on the basis of a procedural irregularity, . . . there must be some evidence that the irregularity 'directly and uniquely disadvantaged a minority employee.'" Id. (quoting Randle, 69 F.3d at 454 n.20). Hamilton cites Mohammed v. Callaway, 698 F.2d 395 (10th Cir. 1983), as authority for her argument that an employer's departure from the stated criteria in a job announcement should invariably create an inference of pretext in an action for employment discrimination. But that stretches the reasoning of Mohammed further than the case will allow. In Mohammed, the undisputed evidence showed that the hiring process at issue was marred by blatant and repeated procedural irregularities, all of which gave rise to a powerful inference that the plaintiff's employer had rigged the system against a particular minority applicant. See id. at 399-401.

Similar irregularities are not present here. Unlike Mohammed, this is not a case in which "the disregarded procedures directly and uniquely disadvantaged a minority employee." Randle, 69 F.3d at 454 n.20 (distinguishing Mohammed from cases, like the present matter, in which the employer's procedural deviation does nothing more than generally disadvantage applicants and has no bearing on their protected status, if any). The sole alleged procedural irregularity in this case—that OCU hired an ABD candidate even though the job announcement called for an applicant with a Ph.D.—did not disadvantage female applicants. It disadvantaged all job applicants with a Ph.D., without

-18-

directly and uniquely disadvantaging any applicant on the basis of gender. OCU did not elevate males to the detriment of females. At worst, it gave ABD candidates—regardless of gender—a boost in the hiring process at the expense of candidates like Hamilton who had already earned their doctorates. Any deviation from the stated hiring criteria in this case, "in and of itself, does not suggest either that [OCU]'s proffered reasons for its employment decisions were pretextual or that [OCU] was motivated by illegal discrimination." Id.

OCU has provided ample evidence "that it believed that it was following its own internal procedures." Id. at 455. And "just because the reasoning relied upon for a certain action is mistaken does not mean that the reason is pretextual." Id. That is the case here: Hamilton has not presented any evidence showing that OCU's hiring decision, "whether wise or mistaken, wasn't honestly arrived at." Roberts v. Int'l Bus. Machs. Corp., 733 F.3d 1306, 1309 (10th Cir. 2013). In short, a reasonable jury could not infer that OCU's proffered reasons for passing over Hamilton and hiring Stutzman are pretextual.

Hamilton contends that a discriminatory motive on the part of OCU can be inferred from the fact that the school's five-member hiring committee included only one woman. We disagree. Wolfe, the committee's female member, testified that she was never relegated to the role of an outsider on the committee: "I felt like I was given full weight as a committee member, and I feel like any comments or concerns that I had were taken very seriously." We also note that another female faculty member, Dr. Brooke

-19-

Hessler, was initially offered a seat on the committee, but she declined due to other obligations. Wolfe's testimony leaves no doubt that she, like her male counterparts on the committee, endorsed Stutzman as the best candidate for the position. None of this adds up to show evidence of pretext.

Hamilton claims that "there is circumstantial evidence of favoritism towards males at OCU, in that there have been no tenured women professors in the philosophy department." But Hamilton offers no other information beyond that simple statistic. Of course, "statistical data showing an employer's pattern of conduct toward a protected class can create an inference that an employer discriminated against individual members of the class." Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th Cir. 1991). But "[s]tatistics taken in isolation are generally not probative of . . . discrimination," Jones v. Unisys Corp., 54 F.3d 624, 632 (10th Cir. 1995), and "statistical evidence on its own will rarely suffice to show pretext," Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1115 (10th Cir. 2007) (quotation omitted).

"We have long required that '[s]tatistical evidence should be closely related to the issues in the case. . . . Even statistics which show prolonged and marked imbalance may not be controlling in an individual discrimination case where a legitimate reason for the employer's action is present.'" Turner, 563 F.3d at 1147 (10th Cir. 2009) (quoting Bauer v. Bailar, 647 F.2d 1037, 1045 (10th Cir. 1981)). Thus, "in order for statistical evidence to create an inference of discrimination, the statistics must show a significant disparity and eliminate nondiscriminatory explanations for the disparity." Fallis, 944 F.2d at 746.

At bottom, "a plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals." Id. (emphasis in original).

The problem with Hamilton's statistical claim is that, without additional evidence, it tells us very little about whether OCU might actually have discriminated against her, specifically, when she sought a promotion to a tenure-track position in the philosophy department. Put another way, Hamilton's "numbers fail to provide any information regarding whether the decision not to hire [her], and that decision alone, involved discrimination on the basis of sex." Turner, 563 F.3d at 1147 (quotation omitted). "Without evidence regarding the number of male and female applicants, interviewees, and the like, the employment statistic is nearly meaningless." Id.

The evidence we do have reveals that the philosophy department at OCU has always been quite small. From 1970 until 1990, it was a department of one. Not insignificantly, the tenured professorship now held by Davidson, the department chair, was initially offered to a woman who turned it down—a fact not discussed by Hamilton. Her statistical claim also lacks any data about the number of male and female applicants to the philosophy department over any given time period, the relative qualifications of those candidates, or the salient differences among them. See Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1110 (10th Cir. 2008) ("Because the statistics fail to account for these variables, they do not constitute evidence of pretext."). Without the benefit of any statistically relevant information to drive our analysis, there is no way for us to know

whether OCU's hiring practices—in its philosophy department or elsewhere—have evinced even the slightest pattern of "disparate treatment between <u>comparable</u> individuals." <u>Fallis</u>, 944 F.2d at 746 (emphasis in original).

Finally, Hamilton's statistic about tenured positions in the philosophy department tells us nothing about OCU's stated <u>nondiscriminatory</u> reason for declining to hire her: that Stutzman, following his impressive interview and teaching demonstration, was seen as the best person to lead the school's debate team to glory. <u>See</u> <u>Turner</u>, 563 F.3d at 1148 ("Because [the plaintiff]'s statistics do not account for her poor interview performance, they are insufficient to create an inference of pretext."). In sum, Hamilton has not offered any evidence that could permit a rational jury to find a genuine issue of material fact about pretext.

We hold that Hamilton has not raised a genuine and material dispute as to whether OCU discriminated against her in violation of Title VII when it decided not to hire her for its new faculty position.

**III**

For the reasons discussed above, the district court's entry of summary judgment in favor of OCU is **AFFIRMED**.

Entered for the Court


Carlos F. Lucero
Circuit Judge

-22-